# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2021AP1450-OA |

| | |
|---|---|
| COMPLETE TITLE: | Billie Johnson, Eric O'Keefe, Ed Perkins and Ronald Zahn,<br>　　　　Petitioners,<br>Black Leaders Organizing for Communities, Voces de la Frontera, League of Women Voters of Wisconsin, Cindy Fallona, Lauren Stephenson, Rebecca Alwin, Congressman Glenn Grothman, Congressman Mike Gallagher, Congressman Bryan Steil, Congressman Tom Tiffany, Congressman Scott Fitzgerald, Lisa Hunter, Jacob Zabel, Jennifer Oh, John Persa, Geraldine Schertz, Kathleen Qualheim, Gary Krenz, Sarah J. Hamilton, Stephen Joseph Wright, Jean-Luc Thiffeault, and Somesh Jha,<br>　　　　Intervenors-Petitioners,<br>　　　v.<br>Wisconsin Elections Commission, Marge Bostelmann in her official capacity as a member of the Wisconsin Elections Commission, Julie Glancey in her official capacity as a member of the Wisconsin Elections Commission, Ann Jacobs in her official capacity as a member of the Wisconsin Elections Commission, Dean Knudson in his official capacity as a member of the Wisconsin Elections Commission, Robert Spindell, Jr. in his official capacity as a member of the Wisconsin Elections Commission and Mark Thomsen in his official capacity as a member of the Wisconsin Elections Commission,<br>　　　　Respondents,<br>The Wisconsin Legislature, Governor Tony Evers, in his official capacity, and Janet Bewley Senate Democratic Minority Leader, on behalf of the Senate Democratic Caucus,<br>　　　　Intervenors-Respondents. |

ORIGINAL ACTION
ON REMAND FROM THE SUPREME COURT OF THE UNITED
STATES

| | |
|---|---|
| OPINION FILED: | April 15, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 19, 2022 |

SOURCE OF APPEAL:

COURT:

COUNTY:

JUDGE:

JUSTICES:

ZIEGLER, C.J., delivered the majority opinion of the Court, in which ROGGENSACK, REBECCA GRASSL BRADLEY, and HAGEDORN, JJ., joined.  REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which ZIEGLER, C.J., and ROGGENSACK, J., joined.  HAGEDORN, J., filed a concurring opinion.  KAROFSKY, J., filed a dissenting opinion, in which ANN WALSH BRADLEY and DALLET, JJ., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the petitioners, there were briefs filed by *Richard M. Esenberg, Anthony F. LoCoco, Lucas T. Vebber* and *Wisconsin Institute for Law & Liberty,* Milwaukee. There was oral argument by *Richard M. Esenberg.*

For the intervenors-petitioners Black Leaders Organizing for Communities, Voces de la Frontera, League of Women Voters of Wisconsin, Cindy Fallona, Lauren Stephenson and Rebecca Alwin, briefs, including amicus briefs, were filed by *Douglas M. Poland, Jeffrey A. Mandell, Rachel E. Snyder, Richard A. Manthe, Carly Gerads* and *Stafford Rosenbaum LLP*, Madison; *Mel Barnes* and *Law Forward, Inc.*, Madison; *Mark P. Gaber* (pro hac vice), *Christopher Lamar* (pro hac vice)and *Campaign Legal Center*, Washington, D.C.; *Annabelle Harless* (pro hac vice) and *Campaign Legal Center*, Chicago.  There was oral argument by *Douglas M. Poland.*

For the intervenors-petitioners Congressmen Glenn Grothman, Mike Gallagher, Bryan Steil, Tom Tiffany and Scott Fitzgerald there were briefs, including amicus briefs, filed by *Misha Tseytlin, Kevin M. LeRoy*, and *Troutman Pepper Hamilton Sanders LLP*, Chicago.  There was oral argument by *Misha Tseytlin.*

For the intervenors-petitioners Lisa Hunter, Jacob Zabel, Jennifer Oh, John Persa, Geraldine Schertz and Kathleen Qualheim, there were briefs, including amicus briefs filed by *Charles G. Curtis, Jr.* and *Perkins Coie LLP*, Madison; *Marc Erik Elias* (pro hac vice), *Aria C. Branch* (pro hac vice), *Daniel C. Osher* (pro hac vice), *Jacob D. Shelly* (pro hac vice), *Christina A. Ford* (pro hac vice), *William K. Hancock* (pro hac vice) and *Elias Law Group LLP*, Washington, D.C. There was oral argument by *John Devaney (pro hac vice), Perkins Coie LLP*, Washington, D.C.

For the intervenors-petitioners Citizens Mathematicians and Scientists Gary Krenz, Sarah J. Hamilton, Stephen Joseph Wright, Jean-Luc Thiffeault and Somesh Jha, briefs were filed by *Michael P. May, Sarah A. Zylstra, Tanner G. Jean-Louis* and *Boardman & Clark LLP*, Madison, and *David J. Bradford* (pro hac vice) and *Jenner & Block LLP*, Chicago. There was oral argument by *Sam Hirsch* (pro hac vice), *Jenner & Block LLP*, Washington, D.C.

For the respondents Wisconsin Elections Commission, Marge Bostelmann, Julie Glancey, Ann Jacobs, Dean Knudson, Robert Spindell, Jr. and Mark Thomsen there were letter-briefs filed by *Steven C. Kilpatrick*, assistant attorney general, *Karla Z. Keckhaver*, assistant attorney general, *Thomas C. Bellavia*, assistant attorney general.

For the intervenors-respondents the Wisconsin Legislature there were briefs, including amicus briefs, filed by *Kevin M. St. John* and *Bell Giftos St. John LLC*, Madison; *Jeffrey M. Harris* (pro hac vice), *Taylor A.R. Meehan* (pro hac vice), *James P. McGlone* and *Consovoy McCarthy PLLC*, Arlington, Virginia and *Adam K. Mortara* and *Lawfair LLC*, Chicago. There was oral argument by *Taylor A.R. Meehan*.

For the intervenor-respondent Governor Tony Evers there were briefs filed by *Joshua L. Kaul*, attorney general, *Anthony D. Russomanno*, assistant attorney general and *Brian P. Keenan*, assistant attorney general. There was oral argument by *Anthony D. Russomanno.*

For the intervenor-respondent Janet Bewley, State Senate Democratic Minority Leader on behalf of the State Senate Democratic Caucus there were briefs filed by *Tamara B. Packard*, *Aaron G. Dumas* and *Pines Bach LLP*, Madison. There was oral argument by *Tamara B. Packard.*

There was an amicus brief filed on behalf of William Whitford, Hans Breitenmoser, Mary Lynne Donohue, Wendy Sue Johnson and Deborah Patel by *Ruth M. Greenwood* (pro hac vice), *The Election Law Clinic, Harvard Law School*, Cambridge, MA; with whom on the brief were law student-practitioners *Mary F. Brown*, *Mark R. Haidar*, *Meredith A. Manda*, *Sarah A. Sadlier*, *Corey M. Stewart*, *Harvard Law School* and *Jakob Feltham* and *Hawks Quindel, S.C.*, Madison.

There was an amicus brief filed on behalf of Concerned Voters of Wisconsin by *Joseph S. Goode*, *Mark M. Leitner*, *John W. Halpin* and *Laffey, Leitner & Goode, L.L.C.*, Milwaukee.

There was an amicus brief filed on behalf of Non-Party Legal Scholars by *Allison Boldt, Robert Yablon* and the *University of Wisconsin Law School*, Madison.

There was an amicus brief filed by *Daniel R. Suhr*, Thiensville.

2

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2021AP1450-OA

STATE OF WISCONSIN                 :        IN SUPREME COURT

Billie Johnson, Eric O'Keefe, Ed Perkins and
Ronald Zahn,

       Petitioners,

Black Leaders Organizing for Communities, Voces
de la Frontera, League of Women Voters of
Wisconsin, Cindy Fallona, Lauren Stephenson,
Rebecca Alwin, Congressman Glenn Grothman,
Congressman Mike Gallagher, Congressman Bryan
Steil, Congressman Tom Tiffany, Congressman
Scott Fitzgerald, Lisa Hunter, Jacob Zabel,
Jennifer Oh, John Persa, Geraldine Schertz,
Kathleen Qualheim, Gary Krenz, Sarah J.
Hamilton, Stephen Joseph Wright, Jean-Luc
Thiffeault, and Somesh Jha,

       Intervenors-Petitioners,

   v.

Wisconsin Elections Commission, Marge
Bostelmann in her official capacity as a member
of the Wisconsin Elections Commission, Julie
Glancey in her official capacity as a member of
the Wisconsin Elections Commission, Ann Jacobs
in her official capacity as a member of the
Wisconsin Elections Commission, Dean Knudson in
his official capacity as a member of the
Wisconsin Elections Commission, Robert
Spindell, Jr. in his official capacity as a
member of the Wisconsin Elections Commission
and Mark Thomsen in his official capacity as a
member of the Wisconsin Elections Commission,

       Respondents,

**FILED**

**APR 15, 2022**

Sheila T. Reiff
Clerk of Supreme Court

2

**The Wisconsin Legislature, Governor Tony Evers, in his official capacity, and Janet Bewley Senate Democratic Minority Leader, on behalf of the Senate Democratic Caucus,**

**Intervenors-Respondents.**

---

ZIEGLER, C.J., delivered the majority opinion of the Court, in which ROGGENSACK, REBECCA GRASSL BRADLEY, and HAGEDORN, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which ZIEGLER, C.J., and ROGGENSACK, J., joined. HAGEDORN, J., filed a concurring opinion. KAROFSKY, J., filed a dissenting opinion, in which ANN WALSH BRADLEY and DALLET, JJ., joined.

---

ORIGINAL ACTION. On remand from the United States Supreme court. *Relief granted.*

¶1 ANNETTE KINGSLAND ZIEGLER, C.J. This is an original action filed by Petitioners Billie Johnson, Eric O'Keefe, Ed Perkins, and Ronald Zahn to remedy malapportionment in Wisconsin's state legislative and congressional districts. On March 3, 2022, this court selected legislative and congressional maps drawn by Governor Tony Evers. Johnson v. Wis. Elections Comm'n, 2022 WI 14, ¶52, 400 Wis. 2d 626, ___ N.W.2d ___. Upon a request for certiorari review by the United States Supreme Court, the Supreme Court granted certiorari and summarily reversed the selection of the Governor's state legislative maps. Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. ___, 142 S. Ct. 1245, 1251 (2022) (per curiam). Racial motivations drove the Governor's selection of district lines, and the Supreme Court reasoned that the court relied on insufficient evidence to endorse such race-based decision making. Id. at 1249-51. The

2

Supreme Court remanded the case to the court for further proceedings regarding the Wisconsin State Senate and Assembly maps. Id. at 1251.

¶2 Upon review of the record, we conclude that insufficient evidence is presented to justify drawing state legislative districts on the basis of race. The maps proposed by the Governor, Senator Janet Bewley, Black Leaders Organizing for Communities ("BLOC"), and Citizen Mathematicians and Scientists ("CMS") are racially motivated and, under the Equal Protection Clause, they fail strict scrutiny.

¶3 By contrast, the maps proposed by the Wisconsin Legislature are race neutral. The Legislature's maps comply with the Equal Protection Clause, along with all other applicable federal and state legal requirements. Further, the Legislature's maps exhibit minimal changes to the existing maps, in accordance with the least change approach we adopted in Johnson v. Wis. Elections Comm'n, 2021 WI 87, 399 Wis. 2d 623, 967 N.W.2d 469. Therefore, we adopt the state senate and assembly maps proposed by the Legislature for the State of Wisconsin.

I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶4 In 2011, the Wisconsin Legislature passed and the Governor signed state legislative and congressional maps after the 2010 census. Over the subsequent ten years, the population of Wisconsin changed; people moved away from some areas and people moved into others. These changes were recognized in the

2020 census, which identified a population increase in the state from 5,686,986 to 5,893,718. See Johnson, 399 Wis. 2d 623, ¶15.

¶5 The Petitioners filed this original action in August 2021 to remedy alleged malapportionment in Wisconsin's state legislative and congressional maps.[1] In September 2021, this court accepted the case, and in October 2021, the court directed the parties to file briefs addressing what factors the court should consider when selecting new maps. Johnson v. Wis. Elections Comm'n, No. 2021AP1450-OA, unpublished order (Wis. Sept. 22, 2021, amend. Sept. 24, 2021); Johnson v. Wis. Elections Comm'n, No. 2021AP1450-OA, unpublished order (Wis. Oct. 14, 2021). On November 17, 2021, the court directed the parties to confer and, if they wished to participate in a discovery period, to file a joint proposed discovery plan by December 3, 2021. Johnson v. Wis. Elections Comm'n, No. 2021AP1450-OA, unpublished order (Wis. Nov. 17, 2021).

¶6 On November 30, 2021, the court issued a decision explaining the framework by which the court would select maps. The court identified that under the Equal Protection Clause of

---

[1] The Legislature is constitutionally tasked with responsibility to act in reapportionment. Wis. Const. art. IV, § 3 ("At its first session after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and assembly, according to the number of inhabitants."). In 2021, after completion of the 2020 census, the Legislature passed new redistricting maps. However, "[that] legislation did not survive the political process." Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶72 n.8, 399 Wis. 2d 623, 967 N.W.2d 469. As a result, this court is called upon to select redistricting maps.

8

the United States Constitution, "a State [must] make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as practicable." Johnson, 399 Wis. 2d 623, ¶24 (quoting Reynolds v. Sims, 377 U.S. 533, 577 (1964)).  This "one person, one vote" principle applies with less force when selecting districts for state legislative maps than it does for congressional maps. "Consistent with principles of federalism, states have limited flexibility to pursue other legitimate policy objectives, such as 'maintain[ing] the integrity of various political subdivisions' and 'provid[ing] for compact districts of contiguous territory.'"  Id., ¶26 (alterations in original) (quoting Brown v. Thomson, 462 U.S. 835, 842 (1983)).  The court explained that, in addition to satisfying all Equal Protection Clause requirements, the court must consider compliance with Section 2 of the Voting Rights Act ("VRA").  Id., ¶27 (citing 52 U.S.C. § 10301).

¶7  Under state law, the court recognized that the Wisconsin Constitution, as with the United States Constitution, imposes a requirement for population equality among legislative districts.  Id., ¶¶28-33 (citing Wis. Const. art. IV, § 3). Although "perfect exactness in the apportionment, according to the number of inhabitants, is neither required nor possible," "there should be as close an approximation to exactness as possible."  Id., ¶28 (quoting State ex rel. Attorney General v. Cunningham, 81 Wis. 440, 484, 51 N.W. 724 (1892)).  Further, the court identified a state constitutional interest in retaining

9

assembly districts within "county, precinct, town, [and] ward lines." Id., ¶35 (quoting Wis. Const. art. IV, § 4). The court recognized that, under federal one person, one vote jurisprudence, bounding districts by county lines may not be possible, but "the smaller the political subdivision, the easier it may be to preserve its boundaries." Id. Finally, the court stated that assembly districts must be "contiguous" and "in as compact form as practicable." Id., ¶¶36-37 (citing Wis. Const. art. IV, § 4). Both the assembly and senate must have single member districts, and assembly districts may not be "divided in the formation of a senate district," i.e., senate districts must "nest" within assembly district boundaries. Id., ¶37 (citing Wis. Const. art. IV, §§ 4, 5).

¶8 In its November 30 decision, the court adopted the "least change approach," whereby the court would select maps that "comport with relevant legal requirements" while "reflect[ing] the least change necessary." Id., ¶72 (citation omitted). The court rejected the suggestion that the court consider partisan fairness and proportional representation of political parties when selecting maps. Id., ¶¶40-52.

¶9 Following the court's November 17 order directing the parties to confer and develop a discovery plan, the parties on December 3, 2021, submitted a joint discovery plan. The parties agreed that any discovery in this case and the legal issues presented therein would be completed by December 23, 2021. They stipulated that no discovery "beyond the exchange of maps, expert disclosures, and any documents or data that a party

10

intends to rely upon or an expert has relied upon" was anticipated. As that information would be included in briefing with the court, the parties consequently undertook no other discovery. See Johnson, No. 2021AP1450-OA, unpublished order, at 2 (Wis. Nov. 17, 2021) (explaining the timeline for filing briefing with the court).

¶10 Between December 15, 2021, and January 4, 2022, the court received hundreds of pages of briefing and expert reports from the parties. The court heard oral arguments on January 19, 2022. Between September 22, 2021, when the court first accepted this original action, and January 19, 2022, when the court held oral arguments, the court received no formal request or motion to permit additional discovery, beyond what was included in the joint discovery plan, or to modify the court's schedule to accommodate discovery needs.

¶11 On January 19, 2022, the court heard a total of five hours of oral arguments over the course of the day. On March 3, 2022, the court issued a decision adopting the Governor's state legislative and congressional maps. Johnson, 400 Wis. 2d 626, ¶52. The court reasoned that the Governor's maps included the least alterations to preexisting maps. Id., ¶¶26-33. In addition, the court said that the Governor's maps complied with the Equal Protection Clause, the VRA, and the Wisconsin Constitution. Id., ¶¶34-51.

¶12 After the court issued its March 3 decision, the Petitioners and the Legislature sought certiorari review by the United States Supreme Court, asserting that the court's adoption

11

of the Governor's state legislative maps constituted a racial gerrymander in violation of the Equal Protection Clause. Congressmen Glenn Grothman, Mike Gallagher, Bryan Steil, Tom Tiffany, and Scott Fitzgerald ("the Congressmen") filed a separate appeal to the Supreme Court, challenging this court's selection of the Governor's congressional map.[2]

¶13 On March 23, 2022, the United States Supreme Court reversed the court's decision to select the Governor's state legislative maps. The Supreme Court confirmed that, under the Equal Protection Clause, a state government cannot draw district maps on the basis of race unless the state satisfies strict scrutiny. Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1248-49. If the state has before it a "strong basis in evidence" for believing the VRA "require[s] [the state] to move voters based on race," and the evidence is district specific, a racially motivated map can satisfy strict scrutiny. Id. at 1249 (quoting Cooper v. Harris, 581 U.S. ____, 137 S. Ct. 1455, 1470 (2017)). However, the state must possess this evidence before it creates maps based on racial classifications. Id. (quoting Shaw v. Hunt, 517 U.S. 899, 910 (1996)).

¶14 In the case before this court, the Supreme Court reasoned that, based on the filings and presentations made by the Governor, the Governor had failed to present a strong

_____

[2] The United States Supreme Court denied review of the Congressmen's appeal. Grothman v. Wis. Elections Comm'n, No. 21A490, 2022 WL 851726 (Mar. 23, 2022) (stay denied). Thus, the March 3 decision to adopt the Governor's congressional map remains unchanged.

12

evidentiary basis for believing the VRA mandated the district lines he drew. Id. at 1249. Specifically, the Supreme Court identified that the Governor's primary explanation for his racially drawn maps was the fact that it was cartographically possible to draw them. Id. According to the Supreme Court, "[s]trict scrutiny requires much more." Id. Based on the record, the Governor's maps failed to satisfy this legal standard. Id.

¶15 The Supreme Court concluded that this court's March 3 decision fell short because this court had concluded only that the "VRA might support race-based districting." Id. (quoting Johnson, 400 Wis. 2d 626, ¶47 ("[W]e cannot say for certain on this record that seven majority-Black assembly districts are required by the VRA.")). Strict scrutiny requires more: it requires strong, district-specific evidence that race-based map drawing is required, not just that it "might" be required. Id. at 1249-50. The Equal Protection Clause "does not allow a State to adopt a racial gerrymander that the State does not, at the time of imposition, 'judg[e] necessary under a proper interpretation of the VRA.'" Id. at 1250 (quoting Cooper, 137 S. Ct. at 1472).

¶16 Further, the Supreme Court indicated that the court failed to properly examine the three-step prerequisites to proving a VRA violation, as stated in Thornburg v. Gingles, 478 U.S. 30, 46-51 (1986). Although, in its March 3 decision, the court cited electoral history analysis provided by BLOC, the court failed to thoroughly examine whether and to what extent

13

that report proved a VRA violation.  Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1249-50.

¶17  Finally, the Supreme Court noted that, when the court examined whether under the totality of the circumstances racial considerations were mandated by the VRA, the court improperly "focused exclusively on proportionality."  Id. at 1250.  "[N]o single statistic provides courts with a shortcut to determine whether a set of single-member districts unlawfully dilutes minority voting strength."  Id. (quoting Johnson v. De Grandy, 512 U.S. 997, 1020-21 (1994)).

¶18  The Supreme Court concluded, "The question that our VRA precedents ask and the court failed to answer is whether a race-neutral alternative that did not add a seventh majority-black district would deny black voters equal political opportunity."  Id. at 1250-51.  "Answering that question requires an 'intensely local appraisal' of the challenged district."  Id. at 1251 (quoted source omitted).

¶19  The Supreme Court remanded the case to us for further proceedings.  The Court explained that we could "choose from among . . . other submissions."  Id.  Alternatively, the court could "take additional evidence if [we] prefer[ed] to reconsider the Governor's maps."  Id.  It instructed, however, that "[a]ny new analysis . . . must comply with our equal protection jurisprudence."  Id.

## II.  ANALYSIS

14

¶20 Five parties submitted maps for the Wisconsin Senate and Assembly: the Governor, Senator Janet Bewley, BLOC, CMS, and the Legislature.

¶21 In line with our November 30 decision, we apply a "least change approach." We "[t]read[] [no] further than necessary to remedy current legal deficiencies." Johnson, 399 Wis. 2d 623, ¶64. In so doing, we "begin with the current boundaries and change them as little as possible." Id., ¶73. Previously, the court indicated that "core retention," or the percentage of voters who remain in their preexisting districts, is an "especially helpful" metric of change. Johnson, 400 Wis. 2d 626, ¶13. Regardless of how much weight is given to core retention as a measure of change, only the Legislature's maps comply with the law, as we explain below. As a matter of law, the Legislature's maps are superior to the available alternatives.

¶22 Under the record presented before us, and with clarification from the Supreme Court, we conclude that the Legislature proposed the only legally compliant maps. The maps proposed by the Legislature also reflect minimal changes to existing maps. Thus, the Legislature's maps are the best, and only, viable proposal. We will first analyze whether the proposed legislative maps comply with federal and state law. We will then discuss the least-change principle.

A. Compliance With The Law
1. The Equal Protection Clause and the VRA

15

¶23 Section 1 of the Fourteenth Amendment states that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." In recognition of this basic constitutional guarantee, the United States Supreme Court has recognized that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." Fisher v. Univ. of Texas, Austin, 570 U.S. 297, 309 (2013) (citations and quotations omitted); accord Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1248 (explaining that government-endorsed racial distinctions "are by their very nature odious" (quotations omitted)).

¶24 The Equal Protection Clause strongly protects individuals from race-based classifications in redistricting. "Racial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions[.]" Shaw v. Reno, 509 U.S. 630, 657 (1993). "Race-based assignments [in voting districts] embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts——their very worth as citizens——according to a criterion barred to the Government by history and the Constitution." Miller v. Johnson, 515 U.S. 900, 912 (1995). Such behavior "threatens to carry us further from the goal of a political system in which race no longer matters——a goal that the Fourteenth and Fifteenth

16

Amendments embody, and to which the Nation continues to aspire." Shaw v. Reno, 509 U.S. at 657.

¶25 Classifications based on race, in redistricting just like in other contexts, "are constitutional only if they are narrowly tailored to further compelling governmental interests." Grutter v. Bollinger, 539 U.S. 306, 326 (2003). This is a "searching judicial inquiry," id., that rejects "any but the most exact connection between justification and classification." Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 720 (2007) (quotations removed). The Supreme Court has "assumed that . . . complying with operative provisions of the Voting Rights Act of 1965" can serve as a compelling interest. However, the government must still satisfy the narrow tailoring and "searching judicial inquiry" that strict scrutiny requires. Grutter, 539 U.S. at 326; Bush v. Vera, 517 U.S. 952, 978 (1996) (plurality) ("Strict scrutiny remains, nonetheless, strict."). In order to satisfy strict scrutiny, there must be a "strong basis in evidence" that the VRA requires the drawing of districts on the basis of race. Miller, 515 U.S. at 922; Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1249 (emphasizing that an observation, based on available records, that race-based districts "may" be required is insufficient to satisfy strict scrutiny).

¶26 Section 2 of the VRA prohibits election practices and procedures that, in the "totality of the circumstances," create

> political processes leading to nomination or election
> in the State or political subdivision [that] are not

17

equally open to participation by members of a [protected] class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b). "[I]nteracting with social and historical conditions," district lines that prevent a cohesive minority from electing their preferred candidate "impairs the ability of a protected class to [exercise voting rights] on an equal basis with other voters." De Grandy, 512 U.S. at 1007. If certain conditions are met in a specific location, the law may require the "drawing of [] majority-minority district[s]." Cooper, 137 S. Ct. at 1487.

¶27 The Supreme Court has demanded that three specific preconditions be met before it can conclude that the creation of additional majority-minority districts may be necessary: "(1) the racial group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the racial group is politically cohesive; and (3) the majority vote[s] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." League of United Latin American Citizens v. Perry, 548 U.S. 399, 425 (2006) ("LULAC") (quotations omitted). These three requirements are called the "Gingles preconditions." Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1250.

¶28 Satisfaction of the Gingles preconditions does not, on its own, prove a VRA violation. To meet the standard, there must be an established record of discriminatory, district-specific effects. The Supreme Court has repeatedly cited a 1982

18

report from the United States Senate which lists numerous factors of potential significance, including, for example, the history and practice of state-sponsored discrimination, the extent to which discrimination hinders the ability of a minority to effectively participate in democratic elections, and the use of racial appeals in campaigning. LULAC, 548 U.S. at 426 (citing Gingles, 478 U.S. at 44-45). In addition, proportionality of effective minority districts to the minority's "citizen voting-age population" can be relevant to the totality of the circumstances analysis. LULAC, 548 U.S. at 436; accord Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1249 ("We have identified as relevant to the totality analysis several factors enumerated in the Senate Report on the 1982 amendments to the VRA, as well as [proportionality]."). Proportionality, however, is "never dispositive." Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1250 (quoting De Grandy, 512 U.S. at 1026 (O'Connor, J., concurring)).

¶29 The VRA requires an "intensely local appraisal" which "pars[es] . . . data at the district level" and evidences a lack of minority electoral opportunity, such that a race-based remedy is needed. Id. at 1250-51; LULAC, 548 U.S. at 432-34 (holding that a majority-Hispanic district was required but an existing map creating a majority-Hispanic district failed to satisfy the VRA, explaining that different Hispanic individuals in different locales had "differences in socio-economic status, education, employment, health, and other characteristics," and there was

19

insufficient evidence of "compactness" under the first Gingles precondition); Cooper, 137 S. Ct. at 1471-72, 1471 n.5 ("[G]eneralized conclusion[s]" of state-wide racial polarization in voting "fail[] to meaningfully (or indeed, at all) address the relevant local question: whether, in a new version of District 1 created without a focus on race, black voters would encounter sufficient[] white bloc-voting to cancel [their] ability to elect representatives of their choice." (quotations omitted)). The inquiry is emphatically not to create "the maximum number of majority-minority districts," regardless of the on-the-ground characteristics of the minority communities under consideration. De Grandy, 512 U.S. at 1016 (reversing a district court's finding of § 2 violation because more Hispanic majority-minority districts could have been created). In other words, a district-specific VRA violation must be demonstrated in evidence before a race-based remedy may be used. Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1249-50 (emphasizing that a state must have evidentiary support for a race-based action "before" the action is taken (citing Shaw v. Hunt, 517 U.S. at 910)); Miller, 515 U.S. at 922; LULAC, 548 U.S. at 437; Cooper, 137 S. Ct. at 1471-72, 1471 n.5.

¶30 Without a "strong basis in evidence" that the VRA requires the use of race to draw legislative districts, Miller, 515 U.S. at 922, race-neutral "traditional districting principles such as compactness, contiguity, and respect for political subdivisions" must control. Shaw v. Reno, 509 U.S. at 647; accord Wis. Legislature v. Wis. Elections Comm'n, 142 S.

20

Ct. 1250-51 (explaining that the VRA requires the use of race in redistricting only when a "race-neutral alternative . . . would deny [a protected class of] voters equal political opportunity").

¶31 Here, examining the available record, we conclude that there is not a "strong basis in evidence" that the VRA requires the use of race to draw majority-black legislative districts. Specifically, there is insufficient evidence to demonstrate that here, black voters have their choice of candidate blocked by a cohesive and oppositional voting bloc. See LULAC, 548 U.S. at 436 (explaining the Gingles preconditions).

¶32 The Governor failed to present evidence that a race-based remedy was necessary under the VRA, but nonetheless drew districts on the basis of race to create seven majority-black districts. Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1249; Miller, 515 U.S. at 922. The Supreme Court recognized that the Governor "provided almost no other evidence or analysis supporting his claim that the VRA required the seven majority-black districts that he drew." Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1249. The Supreme Court further noted that the Governor's "main explanation for drawing the seventh majority-black district was that there is now a sufficiently large and compact population of black residents to fill it apparently embracing just the sort of uncritical majority-minority district maximization that we have expressly rejected." Id. (citation omitted). This is clearly in violation of the Equal Protection Clause, as a race-based remedy

21

cannot precede proof of a VRA violation.  Id. at 1249-50 (citing Shaw v. Hunt, 517 U.S. at 910).  Supreme Court precedent confirms this to be the case.  De Grandy specifically concluded that the "failure to maximize cannot be the measure of § 2." De Grandy, 512 U.S. at 1017.

¶33 The Governor's maps were racially motivated and are thus subject to strict scrutiny.  To determine whether a map is race based, we must examine "direct evidence going to . . . [the map-drawer's] purpose," in addition to circumstantial evidence, such as "a district's shape and demographics."  Shaw v. Hunt, 517 U.S. at 905.  In briefing and at oral argument, the Governor repeatedly asserted that the VRA required the drawing of seven majority-black districts.  He stated in his initial brief that the VRA "requires the drawing of majority-minority districts" and that his maps "create[] seven majority Black districts" because there is now a "sufficiently large and compact population of Black residents" to do so.  In the Governor's response brief he stated, "[S]even majority-minority Black districts can be drawn in Milwaukee and so 'should be.'"  In addition to his overt reliance on race, he indisputably drew districts to reach precise racial targets in district demographics.  The Governor drew seven districts all at almost exactly 51% black voting-age population ("BVAP"), the lowest BVAP being 50.2% and the highest being 51.4%.  See Miller, 515 U.S. at 917-18 (holding that a state subordinated traditional redistricting criteria to race by noting the objective characteristics of the district which strongly indicated racial

22

motivations as well as statements made by map drawers, confirming the use of race in drawing districts).

¶34 The Governor did not present evidence of a VRA violation, despite drawing maps on the basis of race. He produced no evidence of electoral history and no district-specific evidence demonstrating that the black communities he moved among districts would be denied the opportunity to effectively participate in democracy absent his proposed district lines. See 52 U.S.C. § 10301(b); Cooper, 137 S. Ct. at 1471-72, 1471 n.5; LULAC, 548 U.S. at 432, 437. Upon review of this case, the Supreme Court confirmed that "the Governor failed to carry his burden" of showing "the VRA required the seven majority-black districts that he drew." Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1249. As the Supreme Court explained, "[s]trict scrutiny requires much more" than what the Governor produced and relied upon.[3] Id.

¶35 Importantly, the Governor had more than adequate opportunity to produce a sufficient record. The court accepted this case in September 2021. In November 2021, the court directed the Governor to confer with the other parties and develop a joint discovery plan, and in December 2021, an open

---

[3] The dissent critiques the Supreme Court's Equal Protection Clause jurisprudence and restates arguments made by the dissenting justices in the Supreme Court's per curiam opinion. See, e.g., dissent, ¶178 (quoting Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. ___, 142 S. Ct. 1245, 1251 (2022) (Sotomayor, J., dissenting)). Obviously, we must follow the majority's directives.

23

discovery period was held. Oral arguments were held on January 19, 2022, four months after the court accepted this case and two months after the parties conferred on discovery procedure. Notably, in the joint discovery plan, the Governor stipulated that no discovery outside briefs and expert reports produced for the court was needed. Not once did the Governor notify the court that there was a need to develop a more detailed record or that the procedures adopted by the court failed to permit adequate discovery. The Governor chose to place his case on the evidentiary support included in his briefs and expert reports, and as the Supreme Court held, that evidence was not sufficient to justify racially motivated district lines. Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1249-50.

¶36 The same flaws of the Governor's maps exist for Senator Bewley's maps. She, like the Governor, contends that the Gingles preconditions are met and race must be used in order to comply with the VRA. Like the Governor, Senator Bewley puts the cart before the horse: she creates a race-based remedy without district-specific evidence of a VRA violation. To justify her race-based measures, Senator Bewley relies on a single statewide general election, which, at most, suggests that white voters had weaker preference for the Democratic Party candidate than black voters. Such evidence falls far short of demonstrating a VRA violation. It fails to prove whether specific black communities in the Milwaukee-area within Senator Bewley's racially drawn districts would experience bloc-voting

24

resistance from a white majority that could effectively and consistently prevent the election of black-supported candidates. Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1249-51; LULAC, 548 U.S. at 432, 437; Cooper, 137 S. Ct. at 1471-72, 1471 n.5.   Thus, Senator Bewley's legislative maps are likewise disqualified as there is not a "strong basis in evidence" to believe that her racially motivated maps are required under the VRA.   Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1249-50; Miller, 515 U.S. at 922.[4]

---

[4] Hunter Intervenor-Petitioners ("Hunter") originally submitted state legislative maps.   However, Hunter seemingly withdrew those maps from consideration, contending that the court should consider the Governor's maps in lieu of their maps. Hunter's position was made apparent by the conclusion of briefing.   After opening briefing and responses, in its reply brief, Hunter "urge[d] adoption of the Governor's congressional map or, alternatively, the Hunter congressional map . . . ." By contrast, Hunter did not advance support for its state legislative maps.   Hunter stated that the court should "adopt[] . . . either the Governor's or BLOC's legislative maps."   At oral arguments, Hunter reiterated this position.   It stated that it would "stand by" its congressional maps, despite the Governor presenting, in Hunter's opinion, a superior congressional map.   [Oral Arguments 1:59.]   For state legislative maps, Hunter asserted that it would "not argue for" its state legislature maps, reasoning that, in its view, the available alternatives presented by other parties were superior. Id.   Upon remand from the United States Supreme Court, Hunter stood by its decision to support the Governor's legislative maps.   Hunter offered only three options for the court on remand: receive new evidence and "re-adopt the Governor's proposed maps"; "amend the boundaries of [the Governor's] particular districts"; or simply select the Governor's maps without additional analysis on the VRA.   Since Hunter filed its reply brief, it has neither affirmatively asserted nor implicitly suggested that we should consider its state legislative maps.   Instead, it has dedicated the entirety of its arguments toward opposing the Legislature's state legislative maps and supporting the Governor's maps.   Even if we were to

25

¶37 Like the Governor and Senator Bewley, BLOC also provided maps that were racially motivated.  The evidence BLOC produced in support of a VRA violation, while more than either the Governor or Senator Bewley, nonetheless falls short of that required under the law.  On close examination of BLOC's analysis, there exists an inadequate evidentiary basis to support the use of race in drawing BLOC's legislative districts.  At most, BLOC produced incomplete, regional information that was not sufficiently district-specific.  The record BLOC provided cannot overcome strict scrutiny.

¶38 There is no doubt race was a driving factor in BLOC's selection of legislative districts.  BLOC argues in briefing that the VRA requires the use of race to draw seven majority-black districts.  In so doing, BLOC's maps include seven bare majority-black districts like the Governor's maps.  BLOC's maps target exact 51% BVAP thresholds:  seven assembly districts vary between 50.2% and 52.3% BVAP.

¶39 From the start, it is clear by examining the BVAP of BLOC's districts that BLOC's remedy for an alleged VRA violation

---

consider Hunter's maps, they would be rejected for the same reasons we reject Senator Bewley's maps.  Hunter argued that the Gingles preconditions are satisfied and we must use race to "create a seventh Black opportunity district."  However, Hunter presents no district-specific evidence that black voters in particular communities in the Milwaukee area are "usually" denied the opportunity to elect candidates they support.  League of United Latin American Citizens v. Perry, 548 U.S. 399, 425, 432, 437 (2006) ("LULAC"); Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1249-51; Cooper v. Harris, 581 U.S. ___, 137 S. Ct. 1455, 1471-72, 1471 n.5. (2017).

26

is to actually reduce, not increase, the population percentages of black voters. In fact, the BLOC proposed "remedy" is to reduce minority percentage, ranging from 51% to 62% BVAP, to about 50%, in all six current majority-black assembly districts. This same feature is found in the Governor's maps. The Supreme Court explicitly noted this reduction of minority percentages when the Court summarily reversed the Governor's maps. Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1247 n.1 (stating that the Governor "intentionally created seven majority-black districts" by "reducing the black voting-age population in the other six majority-black districts" to a cluster around 51% BVAP).[5]

---

[5] Of course, this concern regarding the reduction of minority percentages is not the same when the Gingles preconditions have been satisfied and the VRA requires a reduction in the percentage of minorities in a given district so as to avoid "packing." See Johnson v. De Grandy, 512 U.S. 997, 1007 (1994) (indicating that the VRA remedy could be necessary where minorities are "pack[ed] . . . into one or a small number of districts to minimize their influence in the districts next door"). However, the court is not aware of a single case where a court has found a sufficient evidentiary basis to apply a race-based remedy and subsequently reduced the percentage of minorities across multiple districts from safe majorities of around 60% to a bare 51%. Compare, e.g., Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections, 835 F. Supp. 2d 563, 582 (N.D. Ill. 2011) ("60 percent of voting-age population is reasonably required to ensure minorities a fair opportunity to elect a candidate of their choice."); Hastert v. State Bd. of Elections, 777 F. Supp. 634, 647 (N.D. Ill. 1991) (noting that a "65% minority population [or 60% minority voting-age population] concentration [is] generally regarded as necessary to ensure minorities a reasonable opportunity to control a district"); Baumgart v. Wendelberger, Nos. 01-C-0121 & 02-C-0366, unpublished slip op., 2002 WL 34127471, at *5 (E.D. Wis. May 30, 2002) (recognizing expert testimony that "a minority district requires an African-American voting age population of at least

27

¶40 To justify the use of race in drawing district lines, BLOC selects eight election results to prove the existence of white voters blocking candidates supported by the black voters. Notably, BLOC's analysis focuses on five election results from Milwaukee County and two election results from the City of Milwaukee. As part of its election analysis, it includes only one election from an elected office at issue, a party primary for the 12th assembly district in 2018. But BLOC explicitly excludes that election from its bloc-voting analysis because it "only covers a small subset of the wider jurisdiction," i.e., it is district specific. No other election analysis of senate or assembly districts for any other district at any other time is provided, and no other evidence on the existence of the Gingles preconditions is provided on the district level. The BLOC analysis is simply devoid of district-specific evidence. Such local evidence is required under the VRA to first demonstrate a violation, thereby necessitating a race-based remedy. Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. 1245, at 1249-51; LULAC, 548 U.S. at 432, 437; Cooper, 137 S. Ct. at 1471-72, 1471 n.5.

¶41 Notably, BLOC does not consider any November general elections, when the candidates for the public offices at issue are selected to represent the districts at issue. The Legislature notes that, in November general elections in the local districts at issue, the black-preferred candidate is

60% to guarantee the election of candidates of choice").

28

rarely, if ever blocked by a white coalition. Although primary data and exogenous elections can be relevant to a VRA analysis, to exclude completely any consideration of the elections that decide who holds the seats under consideration in the districts under consideration is markedly at odds with standard VRA analysis. See, e.g., Cooper, 137 S. Ct. at 1471-72 (examining general election history of a congressional district at issue in the challenge); LULAC, 548 U.S. at 427-28 (explaining general election history in the congressional district at issue); United States v. City of Euclid, 580 F. Supp. 2d 584, 604-12 (N.D. Ohio 2008) (describing non-applicable elections in the context of a detailed review of city council general elections at issue in the lawsuit); Harper v. City of Chicago Heights, 824 F. Supp. 786, 790, 799-800 (N.D. Ill. 1993) (examining the general election history of specific city commissioner offices at issue); see also Bone Shirt v. Hazeltine, 336 F. Supp. 2d 976, 996 (D.S.D. 2004) (explaining a common hierarchy of election history value, when such history is available, noting that "[e]ndogenous elections, contests within the jurisdiction and for the particular office that is at issue, are more probative than exogenous elections"). Without a full and complete accounting of district-specific election results, and the extent to which candidates supported by the relevant black communities are elected to the state senate and assembly in the districts at issue, we cannot conclude that without the use of race, black voters in those districts would lack the same "opportunity . . . to participate in the political process and

29

to elect representatives of their choice" as would other voters. 52 U.S.C. § 10301(b). The court must examine the "totality of the circumstances," not just election data supporting a race-based remedy. Id.

¶42 BLOC's evidence fails because it is not district specific. Even if we were to look beyond that, at best, BLOC's incomplete analysis shows that the black candidate of choice was elected in four out of the eight races.[6] A 50% success rate is hardly strong evidence of extensive racial bloc voting such that the black-preferred candidate is "usually" blocked from office. LULAC, 548 U.S. at 425; see, e.g., Clarke v. City of Cincinnati, 40 F.3d 807, 812-13 (6th Cir. 1994) (noting that the electoral

---

[6] As noted above, BLOC excluded the 2018 Democratic Party primary for the 12th assembly district from its bloc-voting analysis, reasoning that the election was too localized. In that election, the black-preferred candidate was not blocked by a white coalition. Thus, by excluding that election, BLOC contended that the black candidate of choice was blocked in four out of seven races, or 57% of the time. Upon further review of BLOC's analysis, it is apparent that a proper VRA record cannot selectively exclude elections that weigh against a race-based remedy. See 52 U.S.C. § 10301(b) (requiring courts to examine the "totality of the circumstances"); see, e.g., Cooper, 137 S. Ct. at 1471-72 (examining general election history of a congressional district at issue in the challenge); LULAC, 548 U.S. at 427-28 (explaining general election history in the congressional district at issue). In fact, BLOC's reasoning runs counter to Supreme Court precedent, which mandates district-specific evidence of the Gingles preconditions. Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1249-51; LULAC, 548 U.S. at 432, 437; Cooper, 137 S. Ct. at 1471-72, 1471 n.5. Even if we were to look past the fatal deficiencies of BLOC's analysis as a whole, we do not accept BLOC's premise that the 2018 primary for the 12th assembly district can be excluded from its analysis.

30

history for the public offices at issue demonstrated that "47 percent of blacks' preferred black candidates were elected" and thus there was "no reason to find that blacks' preferred black candidates have 'usually' been defeated" under Gingles).

¶43 The Legislature noted that, despite BLOC focusing on county-wide races and including the 2018 Democratic Gubernatorial primary in its analysis, BLOC conspicuously omitted any consideration of the 2018 Democratic Lieutenant Gubernatorial primary in Milwaukee County. BLOC's only response was circular: "This election is less probative of the performance of districts, because it does not simulate an election in which white bloc voting might defeat the choice of Black voters." With the addition of the 2018 Lieutenant Gubernatorial primary in Milwaukee County, the Legislature correctly notes that only four of nine races, using BLOC's own analysis, involve the black-preferred candidate being blocked from office. This does not satisfy the Gingles preconditions for the local black communities at issue.

¶44 The Supreme Court stated explicitly that reliance in the March 3 decision on BLOC's analysis of "eight previous races . . . in the Milwaukee area" was flawed because there was no demonstration that the Gingles preconditions were satisfied at the district level. Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1250 (reasoning that the March 3 analysis on the Gingles preconditions was improper, citing BLOC's electoral evidence, and stating the court "made virtually no effort to parse that data at the district level"). The court's

31

March 3 decision itself acknowledged that "we cannot say for certain on this record that seven majority-Black assembly districts," as proposed by the Governor and BLOC, "are required by the VRA." Johnson, 400 Wis. 2d 626, ¶47.  The Supreme Court has made clear that amount of evidence is inadequate to justify a race-based remedy.  Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1249-50 (evidence showing the VRA "might" require a race-based remedy does not satisfy strict scrutiny).  Upon further review of BLOC's analysis, we conclude that BLOC has not presented sufficient evidentiary support to justify the use of race to draw the legislative districts it proposes.  Id.; Miller, 515 U.S. at 922.  Therefore, BLOC's maps must be rejected.

¶45 CMS's maps, while performing well on several race-neutral criteria, upon further review also fail for being race-based.[7]  "[S]trict scrutiny applies when race is the 'predominant' consideration in drawing the district lines such that 'the legislature subordinates traditional race-neutral districting principles to racial considerations.'"  Shaw v. Hunt, 517 U.S. at 907 (quoting Miller, 515 U.S. at 916).  CMS applied an algorithm that considered thousands of possible alternative maps, and it tasked the algorithm to produce a map that performed best on various metrics of least change,

---

[7] CMS scored well on several race-neutral factors.  For example, CMS's maps had less than half the population deviation of the Governor, Senator Bewley, and BLOC.  In addition, CMS had hundreds fewer local government splits than the Governor, Senator Bewley, and BLOC.

population deviation, and local boundary splits. In addition, it tasked the algorithm to produce seven assembly districts that had "a substantial concentration of black [voters]" and that elected black candidates of choice. CMS did not concern itself with creating districts with exact BVAP amounts, as did the Governor and BLOC. The BVAP in CMS's relevant assembly districts varied widely from 35% to 83.2%.

¶46 Nonetheless, it is clear that under CMS's algorithm, maps would not be selected if they did not create seven districts with substantial black populations that also elected black-preferred candidates, according to its inputs of election data. Although, by using cutting edge technology CMS selected a map that performed well in other race-neutral criteria, alternative maps run through the algorithm that could have performed better on those race-neutral criteria were not considered by CMS because they did not contain seven districts with specific racial characteristics. See Shaw v. Hunt, 517 U.S. at 907 (explaining that a redistricting map was racially motivated, even though race-neutral criteria were considered in the selection of districts, because the race-neutral criteria "came into play only after the race-based decision had been made"). Therefore, we conclude that CMS's maps "subordinated traditional race-neutral districting principles . . . to racial considerations." Miller, 515 U.S. at 916.

¶47 Like other parties, CMS did not present district-specific evidence that the communities being placed in race-based boundaries would be denied equal opportunities in

33

elections and would have their choice of candidates blocked by a white majority coalition if CMS's racially motivated districts were not adopted. 52 U.S.C. § 10301(b). In fact, CMS argued that the Legislature's maps——which, as explained below, are race neutral——would produce six effective districts for black-preferred candidates. In lieu of the local appraisal required under law, CMS cited state-wide election data to show that, on average, black voters in the State of Wisconsin support different candidates than white voters. That is not the relevant local inquiry to determine the existence of the <u>Gingles</u> preconditions, sufficient to trigger a race-based remedy. <u>Wis. Legislature v. Wis. Elections Comm'n</u>, 142 S. Ct. 1245, at 1249-51; <u>LULAC</u>, 548 U.S. at 432, 437; <u>Cooper</u>, 137 S. Ct. at 1471-72, 1471 n.5. Creating race-based districts, as CMS does, without first demonstrating a VRA violation, is fundamentally and constitutionally flawed. <u>Wis. Legislature v. Wis. Elections Comm'n</u>, 142 S. Ct. at 1249-50 (citing <u>Shaw v. Hunt</u>, 517 U.S. at 910).

¶48 In contrast to the maps proposed by the Governor, Senator Bewley, BLOC, and CMS, the Legislature's proposed maps are indisputably race neutral. No party argued and no evidence was provided demonstrating that the Legislature's maps were, in fact, not race neutral. The Legislature affirmed multiple times that the maps proposed by the Governor and BLOC to create exactly 51% BVAP districts were a "racial gerrymander," and by contrast, the Legislature utilized "race-neutral criteria" to draw districts in the Milwaukee area, as it did for all other

34

citizens regardless of race in the remainder of the state. Unlike the other parties, the Legislature never asserted that the Gingles preconditions required the drawing of majority-black districts. To the contrary, the Legislature's expert stated correctly that "the electoral patterns detailed by [BLOC] raise serious doubts about whether the Gingles threshold standard is currently met."[8]

¶49 The Equal Protection Clause "guarantees equal laws, not equal results." Personal Adm'r of Mass. v. Feeney, 442 U.S. 256, 273 (1979). Only those maps that purposefully discriminate between individuals are subject to strict scrutiny. Shaw v. Reno, 509 U.S. at 642. Maps come under strict scrutiny "not just when they contain express racial classifications, but also when, though race neutral on their face, they are motivated by a racial purpose or object." Miller, 515 U.S. at 913. The standard to demonstrate racial motivations through circumstantial evidence alone is high and rarely met. The map must be "so highly irregular that, on its face, it rationally cannot be understood as anything other than an effort to

_____

[8] The Legislature stated that their maps complied with the VRA. A race-neutral map can comply with the VRA. Specifically, a map does not violate the VRA when the Gingles preconditions have not been satisfied. LULAC, 548 U.S. at 425. Indeed, a race-neutral map is the preferred outcome, and an outcome explicitly contemplated by the Supreme Court. Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1250-51 ("The question that our VRA precedents ask and the court failed to answer is whether a race-neutral alternative that did not add a seventh majority-black district would deny black voters equal political opportunity.").

35

segregate[e] . . . voters on the basis of race." Id. at 914 (quotations omitted); Shaw v. Reno, 509 U.S. at 643 (explaining that there are "rare [maps] that . . . are, on their face, unexplainable on grounds other than race" (quotations omitted)); Feeney, 442 U.S. at 272 ("This rule applies as well to a classification that is ostensibly neutral but is an obvious pretext for racial discrimination." (Emphasis added.)). Courts recognize that redistricting is a "sensitive" process which involves a "complex interplay of forces"; mapmakers are "presumed" to be acting in a good faith, race-neutral manner. Miller, 515 U.S. at 915-16.

¶50 No such evidence of discriminatory intent has been provided, and, with the presumption of good faith in mind, we cannot conclude that the Legislature's maps are so highly irregular that they are "unexplainable on grounds other than race." Miller, 515 U.S. at 913; Shaw v. Reno, 509 U.S. at 643. Unlike the Governor and BLOC, who carefully calibrated BVAP in their districts, the BVAP in the Legislature's districts varies depending on the unique geography and community characteristics of those districts. BVAP in the Legislature's districts varies from 45.8% to 71.5%. In so doing, the Legislature's maps perform very well in race-neutral criteria. Out of the plans proposed, the Legislature's maps have low population deviation and have a low number of local government splits, including in the Milwaukee-area districts. In addition, the Legislature's maps include few incumbency pairings, and they move few voters

36

into new senate districts with different election cycles.[9] Those characteristics are seen in the Milwaukee-area districts, as they are throughout the state. Further, the districts with high BVAP are compact and do not have "highly irregular" features common to racial gerrymanders. Miller, 515 U.S. at 917 (reasoning that, although a district did not "seem bizarre on its face," the shape in conjunction with its exacting demographic characteristics painted a "story of racial gerrymandering"); Shaw v. Hunt, 517 U.S. at 905-06 (stating a district was "serpentine" and "geographically non-compact by any objective standard"); Bush v. Vera, 517 U.S. at 959-60 (explaining that, based on the shape of a district, there was "no integrity in terms of traditional, neutral redistricting criteria"). When drawing districts, race-neutral considerations drove the Legislature's decisions; racial targets did not. See Miller, 515 U.S. at 916 (examining, to determine if a map was race neutral, whether the map included exact percentages of black voters in a district and whether the map performed poorly on race-neutral considerations such as compactness, contiguity, and preservation of communities of interest); Alabama Legislative Black Caucus v. Alabama, 575 U.S. 254, 273-74 (2015) (listing evidence that could show a map was not race neutral,

---

[9] Under the Wisconsin Constitution, senators are "chosen alternately from the odd and even-numbered districts for the term of 4 years." Wis. Const. art. IV, § 5. Thus, if voters are moved between odd and even senatorial districts, their ability to participate in senatorial elections could be delayed for several years, as compared to their original districts.

including exact racial demographics and splitting high numbers of local government boundaries); Cooper, 137 S. Ct. at 1468 (explaining that "[u]nconteested evidence in the record show[ed] that the State's mapmakers . . . purposefully established a racial target . . . .").

¶51 "[I]ndividual districts [are] subject to . . . racial gerrymandering challenges." Alabama Legislative Black Caucus, 575 U.S. at 263-64. Logically, if such challenges are brought, the individual district at issue must be examined. Id. Here, no such challenge has been made to the Legislature's maps. No party challenged or presented evidence which would support a claim that any of the districts in the Legislature's maps were racially motivated. In addition, no evidence was presented in the record that could overcome the presumption of good faith or show that any district lines in the Legislature's map, including those districts with high BVAP, were "unexplainable on grounds

other than race."[10]  Miller, 515 U.S. at 913.  On this record, no

available   evidence   exists   showing   that   race   was   "the

_____

[10] The  dissent  indicates  that  the  Legislature  could  have
moved more black voters into Milwaukee-area districts to boost
BVAP.  It also states that the Legislature performed well on
core retention in the Milwaukee area and it split a village that
contains  a  higher  percentage  of  black  voters.   Dissent,  ¶¶189-
191.  Simply  because  the  Legislature  could  have  drawn  maps
differently  does  not  prove,  given  the  "complex  interplay  of
forces"  in  redistricting,  that  the  Milwaukee-area  districts  are
"unexplainable  on  grounds  other  than  race."  Miller v. Johnson,
515 U.S. 900, 913 (1995).   The  dissent  fails  to  examine  in  a
district-specific manner how the Milwaukee-area districts could
be  rationally  drawn  using  race-neutral  criteria,  such  as  respect
for  local  boundaries  and  communities  of  interest  or  least
change.   Citation  to  a  single  municipality  split,  in  a  state
with  thousands  of  local  governments,  as  well  as  strong
performance  on  race-neutral  criteria  such  as  core  retention,  is
a  far  cry  from  an  "obvious  pretext  for  racial  discrimination."
Personal Adm'r of Mass. v. Feeney, 442 U.S. 256, 272 (1979).
High  core  retention,  for  instance,  can  be  readily  explained  by
the  fact  that  the  Milwaukee-area  districts  were  underpopulated
and,  of  course,  a  larger  portion  of  the  core  would  be  retained.
The  Legislature  may  have  reasonably  believed  municipal  splits
were  needed  to  avoid  ward  splits,  achieve  least  change,  and
minimize  population  deviation.   The  dissent  essentially  admits
that  proof  of  a  racial  gerrymander  is  lacking.   It  states  that
it   has   "no . . . submitted   evidence"   on   whether   the
Legislature's  choices  in  Milwaukee  were  driven  by  respect  for
communities  of  interest,  and  it  contends  that  the  maps  could  be
politically  motivated.   Dissent,  ¶191;  see  Rucho v. Common
Cause, 588 U.S. ___, 139 S. Ct. 2484 (2019) (holding that claims
of  partisan  motivation  in  map  drawing  is  not  cognizable  under
the  United  States  Constitution);  Johnson,  399 Wis. 2d 623,  ¶39
(reasoning  that  "partisan  fairness  presents  a  purely  political
question"  and  is  not  derived  from  an  identifiable  legal  right).
The  dissent  cites  to  Cooper,  but  that  case  actually  supports  the
conclusion  that  the  Legislature's  maps  are  race  neutral.
Dissent, ¶190; see Cooper, 137 S. Ct. at 1466, 1468-69, 1472-78,
1482-84  (holding  that  racial  considerations  predominated  where
mapmakers  expressly  stated  they  were  moving  black  voters  to
comply  with  the  VRA,  altering  two  congressional  districts  to
have  almost  exactly  51%  BVAP,  creating  districts  with  a  "finger-
like  extension"  and  a  "snakelike  body,"  having  one  district  with
"stark  racial  borders"  within  the  same  local  government,  and

39

'predominant' consideration in drawing the [Legislature's] district lines such that '[it] subordinate[d] traditional race-neutral districting principles to racial considerations.'" Shaw v. Hunt, 517 U.S. at 907 (quoting Miller, 515 U.S. at 916). To determine otherwise would be wholesale speculation.

¶52 The Governor and BLOC argue that the Legislature's maps violate the VRA by having one assembly district at 45.8% BVAP and another at 71.5% BVAP. However, neither the Governor nor BLOC cite authority standing for the position that, using race-neutral redistricting criteria, having low or high percentages of black voters in a given district on its own violates the VRA. It is well established that the VRA mandates the use of race in redistricting only upon proof that the Gingles preconditions are satisfied in a potential or existing district. LULAC, 548 U.S. at 425; Cooper, 137 S. Ct. at 1471-72; Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. 1245, at 1249-50. It is true that maps can violate the VRA where black voters are "fragment[ed] . . . among several districts where a bloc-voting majority can routinely outvote them" as well as where black voters are "pack[ed] . . . into one or a small number of districts to minimize their influence in the districts next door." De Grandy, 512 U.S. at 1007. But where there exists no strong evidence that an identifiable community of black voters is being denied equal opportunity to participate

---

having another district whose racial composition materially changed despite having "no need for significant total-population changes" under one person, one vote).

due to the existence of the <u>Gingles</u> preconditions, race cannot be used to distribute black voters from one district to another. <u>Id.</u> at 1015 (explaining that the existence of one district with a high percentage of minorities and another district with a low percentage of minorities, by itself, shows "only that lines could have been drawn elsewhere, nothing more"); <u>Gonzalez v. City of Aurora</u>, 535 F.3d 594, 598 (7th Cir. 2008) ("But neither § 2 nor <u>Gingles</u> nor any later decision of the Supreme Court speaks of <u>maximizing</u> the influence of any racial or ethnic group."); <u>Bartlett v. Strickland</u>, 556 U.S. 1, 15 (2009) (plurality) ("Nothing in § 2 grants special protection to a minority group's right to form political coalitions."). No party presents strong evidence showing the existence of the <u>Gingles</u> preconditions in individual districts, as they currently exist, in race-based proposals, or in the Legislature's race-neutral maps. Without that evidence of a VRA violation, a race-based remedy is not justified, whether to boost BVAP in one district to above 50% or to lower BVAP in another district to below 71.5%. <u>Wis. Legislature v. Wis. Elections Comm'n</u>, 142 S. Ct. at 1249-51; <u>LULAC</u>, 548 U.S. at 432, 437; <u>Cooper</u>, 137 S. Ct. at 1471-72, 1471 n.5.

¶53 The Governor and BLOC also argue that the Legislature's 10th assembly district, which has 45.8% BVAP, does not provide effective democratic opportunity for black voters. Thus, the Governor and BLOC aver that the Legislature's maps include only five effective black assembly districts. However, assembly district 10 does not create a VRA violation because the

41

*Gingles* preconditions are not satisfied——namely, the record does not demonstrate that black voters are usually denied their preferred candidate. In fact, the evidence demonstrates otherwise.

¶54 The Governor and BLOC point to BLOC's analysis on a single election result, the 2018 Democratic Gubernatorial Primary, to demonstrate that the 10th assembly district violates the VRA. We are unaware of a single case that has found the existence of a strong evidentiary record, applied the VRA, and satisfied strict scrutiny through consideration of a single result from an exogenous election in a party primary. Compare LULAC, 548 U.S. at 427-28 (examining partisan general election results for the congressional district at issue); Cooper, 137 S. Ct. at 1470-71 (reviewing partisan general election results for the congressional district at issue); City of Euclid, 580 F. Supp. 2d at 598-99 (explaining electoral history for non-partisan general election results for the offices at issue); Harper, 824 F. Supp. at 790 (reviewing non-partisan general election results for the offices at issue). That is a far cry from "strong basis in evidence" demanded by the Equal Protection clause. Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1249; Miller, 515 U.S. at 922.

¶55 Even so, under BLOC's own statistics, the black preferred candidate won in the Legislature's 10th assembly district by a comfortable margin. According to BLOC, the black preferred candidate, Mahlon Mitchell, won a plurality of the vote and beat the next strongest candidate, the Governor, 39% to

42

29%. This indicates that the Legislature's 10th assembly district <u>supports</u> black preferred candidates, not that white coalitions stymie black electoral opportunity in violation of the VRA.

¶56 Nonetheless, BLOC theorizes that, because there were many candidates on the ballot other than Mitchell and the Governor, it is <u>possible</u> white voters <u>may have</u> voted for the Governor and blocked the selection of Mitchell <u>if</u> those other candidates were not on the ballot. This amounts to nothing more than speculation. Whether and to what extent voters would have selected other candidates if their preferred candidates were not on the ballot is unknowable, lying firmly within in the realm of guesswork. The Supreme Court, in this case and in several prior cases, has made it clear that governments cannot rely on presumptions, speculation, and belief to utilize race in redistricting and satisfy a VRA need. See <u>Wis. Legislature v. Wis. Elections Comm'n</u>, 142 S. Ct. at 1249-51; <u>Cooper</u>, 137 S. Ct. at 1470-71; <u>Miller</u>, 515 U.S. at 920-27; <u>Shaw v. Hunt</u>, 517 U.S. at 916. Instead, we must have a "strong basis in evidence" to believe the VRA would be violated if race were not used. <u>Wis. Legislature v. Wis. Elections Comm'n</u>, 142 S. Ct. at 1249; <u>Miller</u>, 515 U.S. at 922. BLOC's evidence on the Legislature's 10th assembly district does not meet that threshold.

¶57 Even if we were to credit BLOC's reasoning, the Legislature provides its own analysis on the 10th assembly district that contradicts BLOC's conclusions. The Legislature did not rely on one election, but instead considered the 2018

43

Democratic Lieutenant Gubernatorial Primary in addition to the 2018 Democratic Gubernatorial Primary. Not only did the Legislature find that the 10th assembly district selected the black-preferred candidate in the gubernatorial primary (as did BLOC), the Legislature also found that the 10th assembly district supported the black-preferred candidate in the lieutenant gubernatorial primary by a wide margin. Given this evidence, the Legislature concluded that this district would not usually exhibit white coalition voting blocking black-preferred candidates. In addition, CMS analyzed the Legislature's 10th assembly district by considering whether "the outcome in most general elections favors the Black candidate of choice" and whether "Mandela Barnes and Mahlon Mitchell [the black candidates of choice in the 2018 Democratic lieutenant gubernatorial and gubernatorial races] perform strongly in their respective 2018 Democratic primary elections." CMS concluded that the Legislature's 10th assembly district was "perfectly effective" for black voters. On this record, we cannot agree with the Governor and BLOC that the Legislature's race-neutral proposal would violate the VRA.

¶58 Finally, the Governor and BLOC argue that the VRA requires the creation of a seventh majority-black assembly district. However, as stated above, we cannot use race in redistricting unless there is strong evidence that the Gingles preconditions are satisfied in the districts being considered. Here, there is no strong evidentiary basis. Furthermore, the court recognized in its March 3 decision that "on this record,"

44

"we cannot say for certain . . . that seven majority-black assembly districts are required by the VRA." <u>Johnson</u>, 400 Wis. 2d 626, ¶47.  The Supreme Court noted that contention and held that level of proof was inadequate to justify a race-based remedy.  <u>Wis. Legislature v. Wis. Elections Comm'n</u>, 142 S. Ct. at 1250 (explaining that a record showing the VRA "might" be violated "does not allow a State to adopt a racial gerrymander").  Consequently, we conclude that the Legislature's race-neutral maps do not violate the VRA simply because they do not include seven majority-black districts.[11]

---

[11] The Governor and BLOC cite proportionality of black voters to support the creation of seven majority-black districts.  First, a VRA violation is not established solely by a determination that effective black districts are not in proportion to the statewide black voting population.  <u>See De Grandy</u>, 512 U.S. at 1020 (rejecting the argument that proportionality is determinative of VRA compliance and noting that "[n]o single statistic provides courts with a shortcut"); <u>Wis. Legislature v. Wis. Elections Comm'n</u>, 142 S. Ct. at 1250 ("[P]roportionality is never dispositive" (citation omitted).). Second, proportionality is considered in a totality of the circumstances analysis, but the totality of the circumstances is considered only after the <u>Gingles</u> preconditions have been established.  <u>LULAC</u>, 548 U.S. at 425; <u>Wis. Legislature v. Wis. Elec. Comm'n</u>, 142 S. Ct. at 1248-50.  Under the record as it currently exists, we cannot conclude the <u>Gingles</u> preconditions are satisfied.  Third, even if proportionality were considered, "the Black voting age population statewide is between 6.1% and 6.5%." <u>Johnson v. Wis. Elections Comm'n</u>, 2022 WI 14, ¶48, 400 Wis. 2d 626, ___ N.W.2d ___.   Taking the highest possible figure, given that there are 99 assembly districts, 6.4 majority-black assembly districts would be proportional to the statewide black voting population.  A proportionality analysis does not support the contention that six majority-black assembly districts would violate the VRA.

45

¶59 The Legislature's maps are race neutral and legally compliant. None of the parties have established that the Legislature's race-neutral maps violate the VRA. At most, the parties in opposition to those maps raise arguments without evidence. In fact, the Legislature would be without any constitutional basis for maneuvering districts to hover closer to 50% as was done by the Governor. Such action would also be contrary to Cooper v. Harris, 137 S. Ct. 1455, and Johnson v. De Grandy, 512 U.S. 997. In short, the Legislator's maps are indisputably race-neutral, supported by the expert testimony and evidence, and there is no detailed, local evidence in the record to demonstrate they violate the VRA. The Governor, Senator Bewley, BLOC, and CMS all drew districts on the basis of race without the necessary proof that the Gingles preconditions were satisfied and that the VRA required a race-based remedy.[12] Thus,

---

[12] The dissenting justices conceded that there is insufficient proof of the Gingles preconditions to warrant a race-based remedy. Johnson v. Wis. Elections Comm'n, 400 Wis. 2d 626, ¶47 (reasoning that the court "cannot say for certain on this record" that the VRA required the drawing of seven majority-black districts on the basis of race); see also Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. 1245, at *3 (citing that exact quote from the court's March 3 decision and explaining that it was inadequate to support a race-based remedy). They bemoan the lack of evidence in support of a race-based remedy, noting that, to prove a VRA violation, parties must rely on extensive "discovery, sworn affidavits, and examination and cross-examination of witnesses and experts," which no party chose to provide. Dissent, ¶¶184, 198 n.28. They explain that the evidence in support of the Gingles preconditions "has not been sufficiently tested through a proper adversarial fact-finding process," and they conclude that we "cannot definitively say the Gingles preconditions are satisfied" in this case. Id., ¶196. When the Gingles preconditions have not been met, we cannot hold that "the VRA

46

no maps other than the Legislature's maps satisfy the requisite constitutional and legal requirements for adoption.

2. The Equal Protection Clause and Population Equality

¶60 As the court explained in our November 30 decision, the Equal Protection Clause requires states to "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as practicable." Johnson, 399 Wis. 2d 623, ¶24 (quoting Reynolds, 377 U.S. at 577). "Consistent with principles of federalism, states have limited flexibility to pursue other legitimate policy objectives, such as 'maintain[ing] the integrity of various political subdivisions' and 'provid[ing] for compact districts of contiguous territory.'" Id., ¶26 (quoting Brown v. Thomson, 462 U.S. at 842). Population equality among districts is measured by maximum population deviation, which is the "sum of the percentage deviations from perfect population equality of the most- and least-populated districts. For example, if the

---

require[s] [us] to move voters based on race." Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. at 1249-50; De Grandy, 512 U.S. at 1007 (stating that the Gingles preconditions are "necessary"). While the dissent goes to great lengths to make known its position on the "totality of the circumstances" and the state of race relations in Wisconsin, we will not engage in a debate on those issues that are not relevant to the inquiry here under the law. Only when all three Gingles preconditions are established are we "direct[ed] to consider the totality of the circumstances." LULAC, 548 U.S. at 425. Evidence of the Gingles preconditions is insufficient on this record to warrant a race-based remedy under the VRA. Therefore, the totality of the circumstances discussion of the dissent is legally insufficient to support the dissent's conclusion.

47

largest district is 4.5% overpopulated, and the smallest district is 2.3% underpopulated, the map's maximum population deviation is 6.8%." Evenwel v. Abbott, 578 U.S. 54, 60 n.2 (2016) (citation omitted).

¶61 Because the maps submitted by Governor, Senator Bewley, BLOC, and CMS are eliminated for being racially motivated, we concentrate our review on the Legislature's maps. In maximum population deviation, the Legislature's maps perform exceptionally well. The Legislature's maps recognize the sizable population shifts, keep Wisconsin citizens in their existing districts and also achieve population equality across districts. The Legislature's maximum population deviation is .57% for the Senate and .76% for the Assembly. This is in line with deviations accepted by federal courts. Wis. State AFL-CIO v. Elections Bd., 543 F. Supp. 630, 639-42 (E.D. Wis. 1982) (adopting maps with 1.2% deviation for the Senate and 1.74% for the assembly); Prosser v. Elections Bd., 793 F. Supp. 859, 870-71 (W.D. Wis. 1992) (labeling deviations below 1% as "margin[s] of error" and adopting a map with a maximum population deviation of .52%); Baumgart v. Wendelberger, Nos. 01-C-0121 & 02-C-0366, unpublished slip op., 2002 WL 34127471 (E.D. Wis. May 30, 2002) (adopting a map with a maximum population deviation of 1.48%). These population shifts are also consistent with or better than prior redistricting plans. Baldus v. Members of Wis. Gov't Accountability Bd., 849 F. Supp. 2d 840, 851 (E.D. Wis. 2012) (2011 assembly districts were .76% and senate were .62%).

48

¶62 Therefore, we conclude that the Legislature's maps comply with the Equal Protection Clause's one person, one vote requirement.

### 3. The Wisconsin Constitution

¶63 "[T]he Wisconsin Constitution requires that districts be compact, contiguous, and proportionally populated; they must respect certain local political boundaries; and the districts must 'nest' three assembly districts within each senate district." Johnson, 400 Wis. 2d 626, ¶34 (citing Wis. Const. art. IV, §§ 3-5). As explained above, we consider whether the Legislature's maps comply with the Wisconsin Constitution because the maps proposed by the other parties are unconstitutionally race based.

¶64 Population equality and respect for local government boundaries are closely interlinked in Wisconsin law. Under Article IV, Section 3 of the Wisconsin Constitution, legislative districts must be apportioned "according to the number of inhabitants." Apportionment among districts must be "as close an approximation to [exact population equality] as possible." Johnson, 399 Wis. 2d 623, ¶28 (quoting Cunningham, 81 Wis. at 484). The court has long recognized that perfect population equality is not required, in large part due to requirements in the Wisconsin Constitution that mapmakers preserve local government boundaries. Legislative districts must be of equal population "subject only to (1) practical limitations in execution of this principle, and (2) precise constitutional restrictions about observance of governmental boundaries in

49

drawing district lines." State ex rel. Reynolds v. Zimmerman, 22 Wis. 2d 544, 566, 126 N.W.2d 551 (1964); see also Cunningham, 81 Wis. at 485 (stating that population equality must be as exact as possible, but also noting that respect for local government boundaries "is a most important restriction on the power of the legislature to make an apportionment"). Nonetheless, mapmakers do have a level of discretion in ensuring population equality. Johnson, 400 Wis. 2d 626, ¶36 n.20.

¶65 Under Article IV, Section 4 of the Wisconsin Constitution, assembly districts must "be bounded by county, precinct, town or ward lines." Given federal one person, one vote requirements, bounding every assembly district by county, precinct,[13] town, and ward lines may not be possible. Johnson, 399 Wis. 2d 623, ¶35 (citing Wis. State AFL-CIO, 543 F. Supp. at 635); see also 58 Wis. Att'y Gen. Op. 88, 91 (1969) ("In my opinion the Wisconsin Constitution no longer may be considered as prohibiting assembly districts from crossing county lines, in view of the emphasis the United States Supreme Court has placed upon population equality among electoral districts.").

---

[13] "In one of this court's seminal cases on redistricting, Chief Justice Lyon explained a precinct was a form of local government that ceased to exist when a part of Article IV of the Wisconsin Constitution became fully operative." Johnson v. Wis. Elections Comm'n, 400 Wis. 2d 626, ¶219 n.16 (Bradley, J., dissenting) (citing State ex rel. Attorney General v. Cunningham, 81 Wis. 440, 520, 51 N.W. 724 (1892) (Lyon, C.J., concurring)). "Under Article IV, 'precinct' does not mean election precinct." Id.

¶66 However, Article IV, Section 4 must be given "full effect" to the extent it does not conflict with federal law. See H. Rupert Theobald, Equal Representation:   A Study of Legislative and Congressional Apportionment in Wisconsin, Wisconsin Blue Book 71, 72 (1970).   We are particularly skeptical of town and ward splits because "the smaller the political subdivision, the easier it may be to preserve its boundaries."   Johnson, 399 Wis. 2d 623, ¶35; see also 60 Wis. Att'y Gen. Op. 101, 106 (1971) (explaining town and ward lines must be followed "insofar as may be consistent with population equality[.]").   In particular, "gratuitously break[ing] up wards," the smallest political unit in the state, makes little sense because they are "the basic unit of Wisconsin state government for voting purposes.   You vote by ward." Prosser, 793 F. Supp. at 866.   For voters in the same ward to have different ballots is an "inconvenience" to the administration of elections and provides, at most, nominal "gain[s] in population equality[.]"   Id.

¶67 The Legislature drew maps that comply with the federal one person, one vote requirements.   The Legislature's deviation was .57% for the Senate and .76% for the Assembly.   Given how low these deviations are, and how few local government splits were included in the Legislature's maps, the Legislature's maps are compliant with Wisconsin's equal apportionment requirements. Wis. Const. art. IV, § 3.

¶68 On March 3, the court opined that the Governor's maps complied with Wisconsin's equal apportionment requirements, and

51

his deviations were almost double that of the Legislature. Johnson, 400 Wis. 2d 626, ¶36 ("[T]he Governor's population deviations——1.20% for the senate and 1.88% for the assembly——are well under the deviations previously adopted by the legislature and those prescribed by this court."). Deviations of .57% and .76% are well within constitutional bounds. Furthermore, in adopting its deviations, the Legislature kept the number of local government divisions low. The Legislature split 53 counties in the assembly, and it split 52 municipalities, including 16 towns. In addition, the Legislature maintained 100 percent of all ward lines.

¶69 The Legislature's resulting number of splits fits well within accepted historical practice. When federal courts drew maps for the 1980, 1990, and 2000 censuses, they included a similar number of local government splits as the Legislature's maps. Wis. State AFL-CIO v. Elections Bd., 543 F. Supp. at 636 (explaining that "municipal splits [were] used sparingly," and adopting a map with no ward splits); Prosser, 793 F. Supp. at 871 (selecting a map with 115 municipality splits and no ward splits); Baumgart, unpublished slip op., 2002 WL 34127471, at *7 (adopting a map with 50 municipality splits and no ward splits). Further, when the 2011 maps were enacted, they had 58 county splits and 78 municipality splits, including 30 town splits, in the assembly. Therefore, the record affirmatively demonstrates that the Legislature retained low population deviations while also limiting divisions of local governments. The Legislature's

52

maps sufficiently respect local government boundaries under the Wisconsin Constitution. Wis. Const. art. IV, § 4.

¶70 The Legislature has satisfied the remainder of Wisconsin's constitutional requirements. The assembly districts are contiguous and sufficiently compact.[14] Wis. Const. art. IV, § 4. Both senate and assembly maps include single member districts, and assembly districts are not divided in the formation of senate districts. Wis. Const. art. IV, §§ 4, 5. In all, the Legislature's senate and assembly maps comply with the Wisconsin Constitution.

## B. Least Change

¶71 In its November 30 decision, the court stated that it would not tread "further than necessary to remedy . . . deficiencies" of the current maps. Johnson, 399 Wis. 2d 623, ¶64. The court's selection would be driven by a decision on which map "comport[s] with relevant legal requirements" while still "reflect[ing] the least change necessary." Id., ¶72.

¶72 The Legislature adopted minimal changes to the existing maps while still complying with federal and state law. While other parties also limited changes to the existing maps, they failed to comply with federal Equal Protection requirements. No other maps comply with all legal requirements. The Legislature's maps address malapportionment in a least

---

[14] "We have never adopted a particular measure of compactness, but the constitutional text furnishes some latitude in meeting this requirement." Johnson, 399 Wis. 2d 623, ¶37.

changes way.    Therefore, the Legislature's maps are our least change selection.

### III.    CONCLUSION

¶73 Upon review of the record, we conclude that insufficient evidence is presented to justify drawing state legislative districts on the basis of race.    The maps proposed by the Governor, Senator Bewley, BLOC, and CMS are racially motivated and, under the Equal Protection Clause, do not survive strict scrutiny.    By contrast, the maps proposed by the Wisconsin Legislature are race neutral.    The Legislature's maps comply with the Equal Protection Clause, along with all other applicable federal and state legal requirements.    Further, the Legislature's maps exhibit minimal changes to the existing maps. Therefore, we adopt the state senate and assembly maps of the Legislature for the State of Wisconsin.

*By the Court.*—Relief granted.

¶74 REBECCA GRASSL BRADLEY, J. *(concurring)*.

"Justice is pictured blind and her daughter, the Law, ought at least to be color-blind."

Brief for Plaintiff in Error, <u>Plessy v. Ferguson</u>, 163 U.S. 537 (1896) (No. 210), 1893 WL 10660, at *19. This redistricting cycle proceeded in a manner heavily focused on color, supposedly for remedial purposes, but accomplishing nothing but racial animosity as showcased by the dissent's race-baiting rhetoric and condescension toward people of color.

¶75 I join the majority opinion in full and write separately to expound on the primacy of color-blindness in Equal Protection jurisprudence. Based on the record in this case, the Constitution mandates a color-blind remedy for the protection of all citizens, irrespective of color. I also write to provide a thorough examination of this redistricting cycle, which demonstrates why the United States Supreme Court summarily rejected the maps selected by a majority of this court: those race-based maps, which were drawn by Governor Tony Evers, violate the Constitution by insidiously sorting people into districts based on the color of their skin. The Wisconsin Legislature drew its maps without regard to race——the only party to do so——therefore, I respectfully concur with the majority's decision to select them.

## I. OUR COLOR-BLIND CONSTITUTION

¶76 The United States Supreme Court rejected Homer Plessy's argument that racial segregation violates the Fourteenth Amendment, to its everlasting shame. <u>Plessy</u> exists in our nation's history as a stain, dishonoring America's quest

1

for equality under the law for all, which began with the founding. See The Declaration of Independence para. 2 (U.S. 1776) ("We hold these truths to be self-evident, that all men are created equal[.]"); see also Wis. Const. art. I, § 1 ("All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed."). At times, the United States has strayed from this sacred principle, often on the basis of sham social science of the day promoting the repugnant notion that people of different races would be better off if the law distinguished between them. See State v. Roberson, 2019 WI 102, ¶43, 389 Wis. 2d 190, 935 N.W.2d 813 ("Social science often embodies the subjective beliefs of the time. When these beliefs become enshrined as constitutional law, they have a long-lasting impact even if proved incorrect at a later date. . . . Plessy embodied abhorrent social beliefs regarding the superiority and inferiority of people based on race. This belief then became law through United States Supreme Court decision-making that was purporting to interpret the United States Constitution. It took more than half a century to correct course because it is difficult to overturn constitutional precedent."). Allowing social science to infect constitutional analysis inevitably "result[s] in grave abuses of individual rights and liberty." State v. Brown, 2020 WI 63, ¶46, 392 Wis. 2d 454, 945 N.W.2d 584 (Rebecca Grassl Bradley, J., concurring), cert. denied, 141

2

S. Ct. 881. "Deplorable decisions such as Plessy v. Ferguson and Buck v. Bell were rooted in evil concepts supported by social science and elitist mores antithetical to the Constitution. Ascertaining and faithfully applying the original meaning of the Constitution's words precludes appalling social science-based notions of the day from infecting constitutional analysis. Only the Constitution can serve as reliable bulwark of the rights and liberty of the people." Roberson, 389 Wis. 2d 190, ¶86 (Rebecca Grassl Bradley, J., concurring).

¶77 Despite the United States Supreme Court's approval of racial segregation in Plessy, the words of Justice Harlan, the lone dissenter, ultimately prevailed:

> [I]n view of the constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved. It is therefore to be regretted that this high tribunal, the final expositor of the fundamental law of the land, has reached the conclusion that it is competent for a state to regulate the enjoyment by citizens of their civil rights solely upon the basis of race.

163 U.S. at 559 (Harlan, J., dissenting) (emphasis added). As Justice Harlan understood, "[t]he moral imperative of race neutrality is the driving force of the Equal Protection Clause." Johnson v. De Grandy, 512 U.S. 997, 1029 (1994) (Kennedy, J., concurring in part and concurring in the judgment) (quoting City of Richmond v. J.A. Croson Co., 488 U.S. 469, 518 (1989)

3

(Kennedy, J., concurring in part and concurring in the judgment)). "As a general matter, the sorting of persons with an intent to divide by reason of race raises the most serious constitutional questions." Id. "Therefore, as a general rule, all race-based government decisionmaking——regardless of context——is unconstitutional." Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 752 (2007) (Thomas, J., concurring).

¶78 As a legal concept, color-blindness is often misunderstood. See generally Peter C. Myers, The Case for Color-Blindness, First Principles, Sept. 2019, at 1. Judges can certainly consider whether a particular government action has had a disparate impact on minorities——our color-blind Constitution does not countenance ignoring incidents of discrimination. See Parents Involved in Cmty. Schs., 551 U.S. at 772 n.19. Under a color-blind approach, however, this court may not order a remedy that purports to address racial discrimination by discriminating on the basis of race. The Constitution prohibits this court from sorting people on the basis of their race. See Holder v. Hall, 512 U.S. 874, 894–96 (1994) (Thomas, J., concurring in the judgment) (explaining the "first generation" of Voting Rights Act (VRA) litigation focused on laws inhibiting ballot access, such as "literacy tests," but over time, the scope of the act was reinterpreted to permit "vote dilution" claims, which present tougher remedial problems).

¶79 The idea that a minority group's voting power has been diluted necessarily requires a subjective inquiry into the share of the vote to which that group is entitled. See id. at 892. Such an inquiry represents a significant departure from the idea of "one person, one vote," a concept premised on the uncontroversial axiom that each person, as an individual, is entitled to "political equality[.]" Gray v. Sanders, 372 U.S. 368, 381 (1963) ("The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing——one person, one vote.").

¶80 The strong evidence necessary to establish the Gingles preconditions ensures a collection of individuals can be fairly deemed, in fact, a community. Communities of interest are sometimes protected as a traditional redistricting criteria. See Johnson v. Wis. Elections Comm'n (Johnson I), 2021 WI 87, ¶83, 399 Wis. 2d 623, 967 N.W.2d 469 (Hagedorn, J., concurring). When the Gingles preconditions are clearly established, a race-based redistricting plan provides a shield protecting communities of interest as opposed to remedy devised solely on the basis of race. Unlike race-based plans, acknowledging people's voluntary association with one another does not offend individual dignity. So long as communities of interest (or their individual members) are not treated differently on the basis of race, the Fourteenth Amendment is not offended.

¶81 Imposing a race-based redistricting plan, without strong evidence of necessity, endorses the stereotype that

5

people of the same race must think alike and must think differently than people of other races. See Holder, 512 U.S. at 903. Governor Evers' plan, adopted by this court on March 3, imposed "distinctions . . . based upon race and color alone," which is "the epitome of that arbitrariness and capriciousness constitutionally impermissive under our system of government." Brief for Appellants, Brown v. Bd. of Educ., 347 U.S. 483 (1954) (No. 1), 1952 WL 82041, at *6-7 (authored in part by Thurgood Marshall) (citation omitted).

¶82 In addition to harming individual dignity, this redistricting cycle is replete with examples of the harm inflicted on all people when courts assume, without a strong evidentiary basis, that the Equal Protection Clause of the Fourteenth Amendment tolerates a particular method of affirmative action. See Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. __, No. 21A471, slip op., at 5 (Mar. 23, 2022) (per curiam) (explaining "the institution that makes the racial distinction must have had a 'strong basis in evidence' to conclude that remedial action was necessary, 'before it embarks on an affirmative action program." (quoting Shaw v. Hunt, 517 U.S. 899, 910 (1996)). Drawing people into districts based on race for the purpose of competing as members of a racial group for political power is antithetical to achieving a more pluralistic society. "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." Parents Involved in Cmty. Schs., 551 U.S. at 748 (plurality). "[S]tate entities may not experiment with race-based means to

6

achieve ends they deem socially desirable." Id. (Thomas, J., concurring).

¶83 The inconclusive pseudo-science presented to this court fell far short of justifying race-based redistricting, as the majority opinion thoroughly explains. It amounted to little more than selectively-cited election data, which appears to have been researched only after-the-fact. That is to say, mapmakers seem to have used racial stereotypes, not legitimate social science, to heuristically draw maps that segregated people based on race. No such "shortcuts"[1] are allowed for proponents of race-based redistricting as a remedy for past discrimination. See United Jewish Orgs. of Williamsburgh, Inc. v. Carey, 430 U.S. 144, 184 (1977) (Burger, C.J., dissenting) ("The record is devoid of any evidence that the 65% figure was a reasoned response to the problem of past discrimination. It is, rather, clear that under the time pressure of upcoming elections, and 'in an atmosphere of hasty dickering,' the New York Legislature simply accepted the standard formula from the Department of Justice and treated it as mandatory." (internal citation omitted)).

¶84 The dissent's ambitious attempt to paint Milwaukee County as the Jim Crow-era South reflects "an effort to cast out Satan by Beelzebub." Frederick Douglass, Speech, The Blessings of Liberty and Education (Sept. 3, 1894). The dissent would remedy what it perceives as racial disparities by literally "draw[ing] lines between the white and the black" with no

---

[1] Dissent, ¶161.

7

apparent recognition that doing so replaces one devil with another. See id. A closer examination of this redistricting cycle and how the VRA can be misused illustrates the problem.

## II. BACKGROUND:
Governor Evers' People's Maps Commission, How It Might Have Harmed Minority Communities in Milwaukee, and His "New" Plan

¶85 [A]t least the Republican map goal was not to decimate the voices of the Black and Brown communities of Wisconsin. . . . I can see the agenda, Mr. Speaker. And the agenda is to dilute and crack and cancel out the voice of minority communities. It's regressive. Just to create more Democratic seats. There is the intent, Mr. Speaker.

Wisconsin Assembly Floor Session, at 2:15:09 (Nov. 11, 2021) (statement of Rep. Sylvia Ortiz-Velez (Assemb. District 8)), https://wiseye.org/2021/11/11/wisconsin-state-assemblyfloor-session-42.

¶86 The people have a "right to know" what happened this redistricting cycle. See Hawkins v. WEC, 2020 WI 75, ¶14, 393 Wis. 2d 629, 948 N.W.2d 877 (Roggensack, C.J., dissenting). Unfortunately, media coverage on this case, like on so many others, has been skewed by partisan pundits disappointed in the "results." See Johnson I, 399 Wis. 2d 623, ¶78 (majority op.) (quoting Patience Drake Roggensack, Tough Talk and the Institutional Legitimacy of Our Courts, Hallows Lecture (Mar. 7, 2017), in Marq. Law., Fall 2017, at 45, 46). See generally Tah v. Global Witness Publishing, Inc., 991 F.3d 231, 255 (D.C. Cir. 2021) (Silberman, J., dissenting in part) ("There can be little question that the overwhelming uniformity of news bias in the United States has an enormous political impact. . . . [T]he

8

press and media do not even pretend to be neutral news services.").

¶87 One media outlet went so far as to run a subheadline attacking the motives of the nation's highest court: "The justices [of the United States Supreme Court] are concerned that Wisconsin's legislative maps may give too much political power to Black people." Ian Millhiser, Black Voters Suffer Another Significant Loss in the Supreme Court, Vox (Mar. 23, 2022), https://www.vox.com/2022/3/23/22993107/supreme-court-wisconsin-race-gerrymander-voting-rights-act-legislature-elections-commission. Worse still, while accusing the justices of indulging an "inflammatory assumption," specifically, "[t]hat legislative maps with fewer Black-majority districts are often preferred to those that give more power to Black voters," the author made an inflammatory assumption of his own, seemingly designed to foster racial tension. See id.; see also Mark Joseph Stern, The Supreme Court's Astonishing, Inexplicable Blow to the Voting Rights Act in Wisconsin, Slate (Mar. 23, 2022), https://slate.com/news-and-politics/2022/03/supreme-court-voting-rights-shredder-wisconsin.html.

¶88 For context, in the early 2000s, Wisconsin had divided government. Republicans controlled the assembly, Democrats controlled the senate, and Governor James Scott McCallum, a Republican, controlled the executive branch.[2] The Legislature

---

[2] Legis. Reference Bureau, Profile of the 2001 Wisconsin Legislature, Wis. Br. 01-3, at 1-2 (Jan. 3, 2001), http://lrbdigital.legis.wisconsin.gov/digital/collection/p16831coll2/id/1073.

did not adopt a redistricting plan; a federal court redrew Wisconsin's state legislative maps. <u>Baumgart v. Wendelberger</u>, No. 01-C-0121, 2002 WL 34127471, at *1, 8 (E.D. Wis. May 30, 2002) (per curiam). Jim Doyle, a Democrat, became governor in 2003. In 2009, Republicans lost control of the assembly. At this time, Democrats gained what is known in political parlance as a "trifecta": they had control of both houses of the state legislature, as well as the executive branch.

¶89 In 2007 and again in 2009, a few Democrats introduced a joint resolution, which would have begun the process of amending the Wisconsin Constitution to significantly alter how district lines are drawn. They did not succeed, leaving Article IV, Section 3 of the Wisconsin Constitution unchanged:

> The members of the assembly shall be chosen biennially, by single districts, on the Tuesday succeeding the first Monday of November in even-numbered years, by the qualified electors of the several districts, such districts to be bounded by county, precinct, town or ward lines, to consist of contiguous territory and be in as compact form as practicable.

The 2007 proposal would have created a "state redistricting board," composed of the attorney general, the secretary of state, the state treasurer, the state superintendent of public instruction, and one member appointed by this court. Analysis Legis. Reference Bureau, 2007 Assemb. J.R. 63. It also would have "define[d] demographic and political standards for the drawing of legislative districts and establishe[d] a procedure for the drawing of legislative districting." <u>Id.</u> The 2009 proposal would not have created a board, but it would have

10

circumscribed the "criteria" the Legislature could consider when drawing districts. Analysis Legis. Reference Bureau, 2009 Assemb. J.R. 29.

¶90 Neither resolution received a floor vote even though Democrats controlled the senate in 2007 and 2008 (but, by a small margin, not the assembly) and controlled both chambers in 2009. When Democrats had a trifecta, they maintained the status quo, i.e., allowing the Legislature substantial discretion to draw lines subject to gubernatorial veto.[3]

¶91 Under the 2002 court-drawn map, Republicans gained control of the Legislature in 2011. That same year, Wisconsin elected Republican Scott Walker governor. The Republican-controlled Legislature drew state legislative districts in the manner prescribed by Article IV, Section 3, which the governor signed. 2011 Wis. Act 43.

¶92 In 2018, Republicans lost their trifecta. Wisconsin elected a Democrat, Tony Evers, to serve as governor. On the eve of the 2020 redistricting cycle, Governor Evers signed Executive Order No. 66 creating the "People's Maps Commission" (PMC), tasked with drawing redistricting maps.[4] Wis. Exec. Order

---

[3] This court's precedent, prohibiting the Legislature from enacting state legislative redistricting plans by joint resolution, does not comport with the Wisconsin Constitution and should be revisited. See Johnson v. Wis. Elections Comm'n, 2022 WI 14, ¶¶253-59, 400 Wis. 2d 626, __ N.W.2d __ (Rebecca Grassl Bradley, J., dissenting), summarily rev'd sub. nom. Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. __, No. 21A471, slip op. (Mar. 23, 2022) (per curiam).

[4] Governor Evers referred this court to both Executive Order No. 66 and the PMC's public website, specifically the "Hearings & Meetings" page.

No. 66 (2020). Never mind the Wisconsin Constitution's "textually demonstrable . . . commitment" of the duty and power to redistrict the state to the Legislature——without any mention of the executive. Johnson I, 399 Wis. 2d 623, ¶51 (quoting Baker v. Carr, 369 U.S. 186, 217 (1962)).

¶93 This commission was "the People's" in name alone. Regardless of its title, Governor Evers, pursuant to the statute he used to create the PMC, retained plenary control over it. Wisconsin Stat. § 14.019(1) (2019-20)[5] states, "[u]nder the general powers of the office of the governor the governor may, by executive order, create nonstatutory committees in such number and with such membership as desired, to conduct such studies and to advise the governor in such matters as directed." Section 14.019(1)(a) continues, "[p]ersons appointed to a nonstatutory committee may be removed or replaced, or the committee may be abolished, by the governor at pleasure." As the plain text of the authorizing statute indicates, the PMC was in no way an independent or non-partisan commission.[6]

---

[5] All subsequent references to the Wisconsin Statutes are to the 2019-20 version.

[6] So-called "independent" or "non-partisan" redistricting commissions have been subject to substantial criticism, even by commentators who decry partisan gerrymandering. Kevin Reyes, Note, Redistricting or Rethinking? Why Proportional Representation May Be a Better Solution than California's Independent Commission, S. Cal. Interdisciplinary L.J. 655, 659-61 (2011). The California Citizens Redistricting Commission is an oft-cited example. Under its handiwork, in 2014, Democratic congressional candidates received 57% of the vote statewide, but won 73.6% of the seats (39 of 53). Andrew Spencer, Christopher Hughes & Rob Richie, Escaping the Thicket: The Ranked Choice Voting Solution to America's Districting Crisis, 46 Cumb. L. Rev. 377, 388 (2016).

¶94 Governor Evers ordered the PMC to "prepare proposed maps for the Legislature to consider" which "shall, whenever possible":

a. Be free from partisan bias and partisan advantage;

b. Avoid diluting or diminishing minority votes, including through the practice of "packing" or "cracking";

c. Be compact and contiguous;

d. Avoid splitting wards and municipalities;

e. Retain the core populations in each district;

f. Maintain traditional communities of interest;

g. Prevent voter disenfranchisement.

Exec. Order No. 66, at 2 (emphasis added). His instruction to "[r]etain the core populations in each district" is particularly striking given the governor's attacks on the legitimacy of the least-change approach. In a press release following this court's November 30, 2021 decision adopting the least-change approach, he stated, "I urged the Wisconsin Supreme Court to consider the maps prepared by a nonpartisan redistricting commission, and it's unfortunate the Wisconsin Supreme Court rejected those maps and decided they will only consider maps that make minimal changes from the gerrymandered maps we have now[.]"[7]

---

[7] Press Release, Gov. Evers Submits New Redistricting Maps Using "Least Change" Approach Pursuant to Court Order, Office of the Governor, State of Wis. (Dec. 15, 2021), https://content.govdelivery.com/accounts/WIGOV/bulletins/3010fc. Notwithstanding Governor Evers' goal for the PMC to "[r]etain the core populations in each district," Attorney General Josh Kaul, a Democrat, declared, "[f]or a court to rule that a court-drawn map must be based on an extreme partisan gerrymander

¶95 The PMC created a memorandum explaining how it understood Governor Evers' order. Among other considerations, it promised to comply with relevant laws, including the VRA.[8] The PMC produced final recommendations at the eleventh hour, too late for thorough analysis before the Legislature was scheduled to consider the maps it created.[9] See Written Testimony of Speaker Robin J. Vos, Joint Public Hearing of the Senate Committee on Government Operations, Legal Review, and Consumer Protection and the Assembly Committee on State Affairs, at 4 (Oct. 28, 2021), https://docs.legis.wisconsin.gov/misc/lc/hearing_testimony_and_m aterials/2021/sb621/sb0621_2021_10_28.pdf ("[T]he draft maps released by the commission contained inconsistent district numbering making our analysis difficult."). The PMC's maps were of such questionable fairness and legality, many members of Governor Evers' party disavowed them.

---

[i.e., the 2011 maps] is simply stunning." Press Release, AG Kaul Issues Statement on Wisconsin Supreme Court Redistricting Decision (Nov. 30, 2021), https://www.doj.state.wi.us/sites/default/files/news-media/11.30.21_Redistricting.pdf.

[8] Memorandum from the People's Maps Commission, Criteria for Drawing Districts, at 2 (last visited Apr. 4, 2022), https://evers.wi.gov/Documents/PMCCriteriaMemoFINAL.pdf.

[9] Governor Evers held a press conference on November 2, 2021 releasing the final recommendations of the PMC. News Conference, Gov. Evers on People's Maps Commission Final Maps Submissions (Nov. 2, 2021), https://wiseye.org/2021/11/02/news-conference-gov-evers-on-peoples-maps-commission-final-map-submissions/. At this point, the legislative process was far along, so many legislators had already begun to evaluate the PMC's drafts——not their final work product.

¶96 Notwithstanding Governor Evers' arguments before this court for maximizing the number of majority-minority districts, the PMC proposed maps with only three Black majority districts: two in the assembly and one in the senate.[10] Governor Evers' own commission proposed <u>eliminating</u> four Black majority districts in the assembly and one in the senate; nevertheless, Governor Evers told this court and the United States Supreme Court that the failure to <u>add</u> a Black majority district in the assembly would violate the VRA.[11] Governor Evers' commission also significantly

---

[10] <u>People's Maps Commission Final Map Submissions</u> (<u>PMC's Final Maps</u>), The People's Maps Commission (updated Nov. 3, 2021), https://govstatus.egov.com/peoplesmaps/work-records (click "District Link Here" for either the "Assembly Map" or the "Senate Map"; then click "Evaluation"; then click "Population by Race").

[11] During an executive session of the Senate Committee on Government Operations, Legal Review, and Consumer Protection, the chairman, Senator Duey Stroebel, noted the PMC's assembly map had significantly fewer majority-minority districts than the Legislature's proposal; Democratic committee members had no response. Executive Session of the Wisconsin Senate Committee on Government Operations, Legal Review, and Consumer Protection, at 12:37 (Nov. 4, 2021) (statement of Senator Duey Stroebel (Sen. District 20)), https://wiseye.org/2021/11/04/senate-committee-on-government-operations-legal-review-and-consumer-protection-9/ ("[T]he last item would be majority-minority districts. SB [621], six Black . . . assembly and two Black senate. . . . People's Maps Commission, two Black . . . assembly, one Black senate[.]").

Senator Stroebel also noted the similarity between the criteria established by Executive Order No. 66 and 2021 Senate Joint Resolution 63, which established the criteria the Legislature used. Both sets of criteria included, among other things, core retention. <u>Compare</u> Wis. Exec. Order No. 66, at 2 (2020) ("whenever possible . . . [r]etain the core populations in each district"), <u>with</u> 2021 S. J.R. 63 ("Retain as much as possible the core of existing districts"). Democrats had no response.

15

reduced the Hispanic population in the one of the two Hispanic majority districts that a federal court held were necessary for VRA compliance——although it did keep the Hispanic population above a majority. Specifically, the PMC drew the district with a Hispanic population of approximately 63.3%.[12] The Hispanic voting-age population (HVAP) in that district is currently 67.2%.[13]

¶97 The PMC expressed little concern about the VRA.[14] A substantial portion of the public hearing discussed the purported harms of <u>partisan</u> gerrymandering, not <u>racial</u> gerrymandering——in fact, it permeated the entire commentary of one of the speakers.[15]

---

[12] <u>PMC's Final Maps</u>. I assume the PMC used voting-age population, although whether it did so is unclear from its public website.

[13] The PMC would have slightly increased the Hispanic population in the other Hispanic majority district; however, that district would have had less than a 60% Hispanic population nonetheless.

[14] <u>People's Maps Commission Online Public Hearing | 4th Congressional District</u> (<u>PMC's VRA Hearing</u>), YouTube (Jan. 14, 2021), https://www.youtube.com/watch?v=qdagL0feabA&t=2s. Based on the PMC's final report, other public hearings may have discussed the VRA, but this particular hearing was the only one designated for discussion of the VRA. The People's Maps Commission, <u>Final Report and Maps of the People's Maps Commission</u>, at A6 (2021), https://evers.wi.gov/Documents/PMC/PMC_Report_Final_Full-compressed%20(2).pdf.

[15] The speaker discussed, among other things, <u>Gill v. Whitford</u>, 585 U.S. __, 138 S. Ct. 1916 (2018), and the "efficiency gap," which is a purported way to measure the partisan fairness of a redistricting plan that was at the heart of <u>Gill</u>.

16

¶98 The commissioners admitted their inexperience in this area of law. Although the PMC invited two attorneys, both acknowledged they lacked competence to give legal advice about the VRA. These speakers described the VRA as a "passion" but admitted primarily practicing other areas, such as employment law.[16] Notably, one of the commissioners asked the speakers if the PMC's plans could be "misconstrued" as a "racial gerrymander," to which the answer was, "I guess it could be."[17]

¶99 No Democrat in the assembly was willing to introduce the PMC's maps. See Wisconsin Assembly Floor Session, at 1:35:30 (statement of Speaker Robin J. Vos). Speaker Robin J. Vos, a Republican, did so. On the assembly floor, Democrats castigated Governor Evers for placing the Democratic Party's goals above minority communities' needs.

¶100 Representative Sylvia Ortiz-Velez, a Latina Democrat from Milwaukee County, rose for the first time in her tenure to voice her concerns. "[A]t least the Republican map goal was not to decimate the voices of the Black and Brown communities of Wisconsin," she stated. Id. at 2:15:09 (statement of Rep. Sylvia Ortiz-Velez). Among her concerns, she identified the PMC's proposed reduction of the HVAP in at least one Hispanic

---

[16] PMC's VRA Hearing, at 1:39:14.

[17] Id. at 1:25:01. From the commissioner's question, it appears the PMC (or at least some of its members) thought it could simply relabel the consideration of "race" as the consideration of a "community of interest." Labelling does not fix the problem. Only if the Gingles preconditions are satisfied may the treatment of a racial group as a community of interest be lawful.

17

majority district. She explained the Hispanic population typically has low voter turnout and some members of the community are counted for census purposes even though they cannot vote.[18] Id. at 2:11:35.

¶101 Representative Ortiz-Velez also said the PMC's maps "promote[] a white supremacy agenda that says it's okay for other folks . . . who we don't choose to rule over us and make decisions for us." Id. at 2:16:01. She noted the PMC's maps were "unconstitutional for several reasons," and "[w]e can litigate that in the courts. We know there's a third branch. And we'll get our justice there because the law is on our side[.]" Id. at 2:15:30. According to Rep. Ortiz-Velez, the PMC had "dilute[d] and crack[ed] and cancel[ed] out the voice of minority communities. . . . Just to create more Democratic seats." Id. at 2:16:44. She said similar Democratic Party

---

[18] Standing alone, low turnout is an unlawful basis for drawing a majority-minority district. The VRA guarantees equal opportunity, not equal success. United States v. Euclid Sch. Bd., 632 F. Supp. 2d 740, 763 (N.D. Ohio 2009) ("That being said, there is no right under the Voting Rights Act to win; there is, rather, a right to meaningfully compete. While the effects of long-standing electoral discrimination on voter turnout are undeniable, there is assuredly some point at which potential voters must themselves come to the polls. This is likely the reason that four of the five courts previously to consider the threshold of exclusion employ VAP in their treatment of the concept, as opposed to a consideration of historical turnout." (internal citation and citations omitted)). Increasing the minority population in a district solely in response to low turnout actually has the troubling consequence of "artificially cap[ping]" minority voting power. Id. at 765. The remedy for low turnout——packing minority voters into fewer districts——necessarily reduces the power the minority group could have if its members turned out at a higher rate.

18

plans were being proposed and adopted nationwide. Id. at 2:18:00.

¶102 Of particular frustration to Rep. Ortiz-Velez was the manner in which she and other members of minority communities had been treated by the executive branch:

> We were shut out of the process by the executive branch. We tried, Mr. Speaker. There was a concerted effort by the executive branch to lock us out of the process so we couldn't act as a check. I want the record to reflect that many members of this body, and at least one member of the Senate, Senator Lena Taylor, have repeatedly tried to stop this injustice before it happened. Including myself, Mr. Speaker. We tried many times speaking with the Governor's Office and the People's Maps Commission to address our concerns, and we were basically dismissed, gaslighted, and ignored.

Id. at 2:19:46. On this point, she concluded, "Mr. Speaker there was a significant lack of responsiveness on [the] part of the elected officials to the particular needs of the members of a minority group." Id. at 2:20:23.

¶103 Representative LaKeshia Myers, a Black Democrat from Milwaukee County, spoke next. She said, "[t]his body is based off population. So I know I didn't teach math, but if you got almost 100 and you got 6.4 that sounds like it should be six seats." Id. at 2:38:06 (Rep. LaKeshia Myers (Assemb. District 12)). Because the PMC's proposed assembly map proposed only two, she strongly encouraged her colleagues to vote against it.

¶104 Representative Marisabel Carbrera, a Latina Democrat from Milwaukee County, voiced similar concerns:

> Mr. Speaker, you said a few moments ago the following about the People's Maps Commission's Maps. Its process might have violated Wisconsin's open meetings

19

laws, it violates the Voting Rights Act, more elections are paired, more Wisconsinites will not be able to vote for senators, and more counties are split. I have to say Mr. Speaker, this time I happen to agree with you.

Id. at 2:53:11 (statement of Rep. Marisabel Carbrera (Assemb. District 9)). She concluded, "I believe the PMC did not accomplish its stated mission. . . . Fair maps would not sacrifice the voting rights of Black and Latino voters." Id. at 2:53:37 (emphasis added).

¶105 Following these speeches, the assembly voted down the PMC's maps by a vote of 77-21.[19] For context, according to the official assembly profile, the assembly had 60 Republicans, 38 Democrats, and one vacant seat.[20] A substantial portion of Governor Evers' fellow Democrats voted against his maps. Executive Order 66's time had not come. It would not be done.[21]

¶106 The concerns of Democratic representatives had been voiced by Democratic senators just three days earlier. Senator Lena C. Taylor, a Black Democrat from Milwaukee County, declared the PMC's maps were the worst of all options because of their

---

[19] The senate also voted down the PMC's maps on a bipartisan vote of 22-11.

[20] Louisa Kamps, Profile of the 2021 Wisconsin Legislature 2 (2021), https://docs.legis.wisconsin.gov/misc/lrb/lrb_reports/2021_wisconsin_legislature_profile_5_3.pdf.

[21] DARTH SIDIOUS: The time has come. Execute Order Sixty-Six.

    CLONE COMMANDER BACARA: It will be done, My Lord.

Star Wars: Episode III – Revenge of the Sith (Lucasfilm Ltd. 2005).

20

utter disregard for minority communities, which she noted likely violated the VRA. Wisconsin Senate Floor Session, at 1:12:04 (Nov. 8, 2021) (statement of Sen. Lena Taylor (Sen. District 4)), https://wiseye.org/2021/11/08/wisconsin-state-senate-floor-session-34/. Similar to Rep. Ortiz-Velez's comments a few days later, Senator Taylor explained the voters in Black majority districts cannot be reasonably expected to elect Black-preferred candidates unless the Black voting-age population (BVAP) is well above 50%. Id. at 1:04:30, 1:14:00.

¶107 Despite the turbulent history of the PMC, Governor Evers told this court his creation of the PMC supported his intervention in this case:

> [T]he Governor has ongoing involvement with the redistricting process. That is embodied in the Governor's Executive Order #66 that creates the nonpartisan People's Maps Commission, which is tasked with seeking input and drawing impartial maps for the Legislature and Governor to consider. The Commission, and the relevance its plan would have to the remedy stage of a redistricting lawsuit, provides a . . . reason for the Governor's intervention.

He concluded, "[t]he Commission's maps would be highly relevant to a court's task in a reapportionment action. The legal and factual considerations used by the Commission when drawing its maps will parallel the considerations before the court when addressing redistricting."

¶108 At some point after this court granted Governor Evers' intervention motion, he changed his mind about the PMC. If his commission had followed his direction to "whenever possible . . . [r]etain the core populations in each district" it might have produced maps that could plausibly be labelled

21

least-change. Exec. Order No. 66, at 2. Although the PMC's maps did not do so, much of Governor Evers' "new" plan consisted of materials recycled from the PMC's plan. Governor Evers, however, abandoned the PMC's proposal for only two Black majority assembly districts and only one Black majority senate district. In contrast, Black Leaders Organizing for Communities (BLOC) proposed seven Black assembly districts and two Black senate districts. As the United States Supreme Court noted in its decision summarily reversing this court's selection of Governor Evers' state legislative districts, BLOC argued, based on its expert's analysis, Governor Evers' proposal violated the VRA. See Wis. Legislature, slip op., at 6 n.2 (citations omitted); see also Johnson v. Wis. Elections Comm'n (Johnson II), 2022 WI 14, ¶¶91, 112, 400 Wis. 2d 626, __ N.W.2d __ (Ziegler, C.J., dissenting), summarily rev'd sub. nom. Wis. Legislature, slip. op. ("The only support presented in an attempt to justify race-based districts was submitted by a party who contends the Governor's maps violate the VRA: BLOC. . . . No party except BLOC presented any details on the state and condition of minority communities in the districts at issue, and even that evidence is deeply flawed. . . . Strikingly, under BLOC's analysis, the Governor's maps do not satisfy the VRA, and are thus unconstitutional. The majority not only lacks evidence to support the maps it adopts, but the only party who even attempted to prove a VRA need determined those maps were illegal.").

22

¶109 Governor Evers' "new" approach to the VRA was similar to BLOC's: both maximized the number of majority-minority districts by drawing them at just above 50% BVAP primarily by arbitrarily adding White people as "filler[.]"[22] Johnson II, 400 Wis. 2d 626, ¶72.

| Wisconsin State Legislative Districts | BVAP in Governor Evers' Proposed Maps |
|---|---|
| Senate District 4 | 50.62% |
| Senate District 6 | 50.33% |
| Assembly District 10 | 51.39% |
| Assembly District 11 | 50.21% |
| Assembly District 12 | 50.24% |
| Assembly District 14 | 50.85% |
| Assembly District 16 | 50.09% |
| Assembly District 17 | 50.29% |
| Assembly District 18 | 50.63% |

As Chief Justice Ziegler wrote in her March 3 dissent:

> [I]t is striking how explicitly the Governor——and the majority——divided up Wisconsin districts solely by race. While in 2011 the Legislature drew six assembly districts that have a majority of black voting-age populations ("BVAP"), ranging from 51% to 62%, the Governor carves seven districts by race with the exactness of only the most gifted social scientists. According to the Governor himself, he drew seven districts with BVAP ranging from 50.1% to 51.4%. At

---

[22] Counsel for the Citizen Mathematicians & Scientists warned this court at oral argument that in his many years of redistricting experience, he had seldom seen such a heavy focus on race in a judicial proceeding. He used the phrase "White filler" to describe a redistricting practice of certain other parties, and candidly acknowledged the Legislature's Black opportunity districts would perform.

23

oral argument and in briefing, it was clear that race imbued the decisions of the Governor in drawing districts. Explaining his district boundaries, he stated the intent was "to produce seven majority Black districts in the Assembly."

Id., ¶87. Governor Evers' approach stands in sharp contrast to the Legislature's, which used race neutral criteria, as the majority opinion explains.

¶110 To achieve what Governor Evers deemed the right racial balance in each district, he disregarded redistricting principles enshrined in the Wisconsin Constitution. Even assuming the Gingles preconditions are satisfied (they are not), he cannot subordinate these principles unless it is "reasonably necessary"——which it is not. See Bush v. Vera, 517 U.S. 952, 979 (1996) (lead op.) ("[T]he district drawn in order to satisfy § 2 must not subordinate traditional districting principles to race substantially more than is 'reasonably necessary' to avoid § 2 liability.").

¶111 Governor Evers' oddly shaped districts are numerous—— and many of the odd shapes in his plan are analogous to the PMC's. For example, Governor Evers redrew Senate District 4, currently represented by Sen. Taylor, to extend into Waukesha and Ozaukee Counties.[23] The result was a substantial decrease in BVAP. Under his plan, Assembly District 11 would extend to Mequon. In critiquing a similar feature of the PMC's map, Rep. Myers rhetorically asked, "[w]hy? That's going to cross the

---

[23] "By comparison, the Legislature's Senate District 4 ends at the Milwaukee County line and does not move a single individual to a new senate district." Legislature's Resp. Br. at 11.

24

county line. Doesn't make sense. Doesn't make sense at all. . . . That's not going to stick when it comes to people's interest. That's not going to stick when it comes to thinking you're going to elect people that look like me." Wisconsin Assembly Floor Session, at 2:47:55 (statement of Rep. LaKeshia Myers). Without any VRA-grounded justification, Governor Evers violated Article IV, Section 4 the Wisconsin Construction, which requires assembly districts "to be bounded by county, . . . town, or ward lines[.]"

¶112 Governor Evers' plan also would have harmed the Black community by forcing it to bear the brunt of disruption stemming from redistricting. While demonstrating high overall core retention, Governor Evers concentrated major changes in Milwaukee County, proposing what the Legislature fairly labelled a "most-change Milwaukee" map. According to the Legislature, Governor Evers' plan would have retained merely 72.6% of Milwaukee-area voters in their current district. In accordance with the principles expounded in our November 30 opinion, this court rightly rejects a "most-change Milwaukee," as the Legislature did with a bipartisan vote months ago. "State authorities" should not "localize the burdens of race reassignment" on a particular community. United Jewish Orgs., 430 U.S. at 174-75 (Brennan, J., concurring in part). It leaves "the impression of unfairness" when a discrete and insular minority "disproportionately bears the adverse consequences of a race-assignment policy." Id. at 175.

25

¶113 In contrast to Governor Evers' plan, the Legislature's plan does not engage in the systematic and discriminatory dismantling of districts in Milwaukee. Governor Evers would sever Black voters' existing constituent-representative relationships and undermine existing voter coalitions, while largely preserving them for White voters. Whether maximizing majority Black voting districts would actually benefit the Black community remains highly suspect. Had it survived the scrutiny of the United States Supreme Court, Governor Evers' plan arguably would have limited Black communities' political power. Senator Taylor wrote an amicus brief to the United States Supreme Court explaining how Governor Evers' maps "dilute[] the voting strength of Black voters in Wisconsin." Motion for Leave to File and Brief for Senator Lena C. Taylor as Amicus Curiae in Support of Neither Party, at 2, Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. __ (2022) (No. 21A471). She continued, "the [Wisconsin] supreme court's conclusion——with no analysis whatsoever——that the Governor's map complies with the Voting Rights Act is clearly erroneous. . . . It made no determination of whether the Governor's map——or any other—— contains seven Assembly districts with an effective Black majority." Id. at 2, 11-12.

¶114 Senator Taylor expressed concern that Governor Evers had drawn "bare-majority-minority-Black districts," which, as a practical matter, "would not be able to nominate their preferred candidates[.]" Id. at 2. She noted, "this Court has repeatedly explained that even majority-minority districts can violate the

26

Voting Rights Act if they do not contain a sufficiently large majority to provide minority voters with a realistic opportunity to elect candidates of their choice." Id. at 12 (citations omitted). She cited, among other decisions, Baldus v. Members of the Wisconsin Government Accountability Board, in which a three-judge panel in the Eastern District of Wisconsin concluded 60.52% HVAP did not create "a functioning majority-minority district for Milwaukee's Latino community." 849 F. Supp. 2d 840, 858 (E.D. Wis. 2012) (per curiam).

¶115 While the dissent decries denying the parties another opportunity to develop new evidence to support a different outcome, the dissent cannot plausibly contend the parties were not fully afforded the opportunity to conduct discovery when the case commenced. Senator Taylor criticized Governor Evers' evidence, noting the governor's expert "did not perform a racial bloc voting analysis or a performance analysis of the Governor's map or any other." Motion for Leave to File and Brief for Senator Lena C. Taylor as Amicus Curiae in Support of Neither Party, at 5. Absent such analysis, "there is no evidence whatsoever that the Governor's map contains seven opportunity districts." Id. at 12.

¶116 Ultimately, Senator Taylor maintained the result, if not the goal, of Governor Evers' maps was something other than ensuring opportunity for Black voters. Similar to the comments of Rep. Ortiz-Velez on the assembly floor regarding the PMC, Senator Taylor noted Governor Evers' plan would create seven "reliable Democratic district[s], but it would not provide Black

27

voters with the opportunity that the Voting Rights Act requires." Id. at 2. That is to say, Governor Evers' concept of what made a Black vote effective was whatever advantaged his political party.

¶117 Governor Evers' color-emphasizing approach is remarkably different than the Legislature's color-blind approach. The Legislature did not consider race as a criterion in drawing its maps. In Speaker Robin J. Vos's written testimony on the Legislature's redistricting bill (which contained the maps the Legislature ultimately submitted to this court), he explained:

> Republican Legislative employees crafted these maps within the confines of the state capitol and completed this work on their own without the involvement of outside counsel or redistricting experts. These employees were instructed not to consider race when drafting the legislative maps, instead, relying on classic redistricting principles, adjusting for population changes.[24]

During his oral testimony, Speaker Vos reaffirmed the maps' race neutrality in response to questions from committee members.[25] Senator Devin LeMahieu, the senate majority leader, also

---

[24] Written Testimony of Speaker Robin J. Vos, Joint Public Hearing of the Senate Committee on Government Operations, Legal Review, and Consumer Protection and the Assembly Committee on State Affairs, at 4 (Oct. 28, 2021), https://docs.legis.wisconsin.gov/misc/lc/hearing_testimony_and_m aterials/2021/sb621/sb0621_2021_10_28.pdf (emphasis added).

[25] Joint Public Hearing of the Senate Committee on Government Operations, Legal Review, and Consumer Protection and the Assembly Committee on State Affairs, at 1:44:35 (Oct. 28, 2021) (testimony of Speaker Robin J. Vos), https://wiseye.org/2021/10/28/joint-committee-on-government-operations-and-state-affairs/.

28

testified the maps are race neutral: "[W]e reached out to minority groups seeking feedback on Wisconsin's current majority-minority districts to ensure maps that fully comply with state and federal law. The Fourteenth Amendment prohibits us from passing a law that discriminates on the basis of race. Therefore, the new maps were drafted without the use of race data at any point in the process to ensure compliance with the Fourteenth Amendment." (emphasis added).[26]

¶118 The Legislature has repeatedly told this court its maps are race neutral. No party presented any evidence to this court calling into question the Legislature's attorneys' compliance with their duty of candor, but the dissent nevertheless lodges the accusation. See SCR 20:3.3 (a)(1) ("A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]").

¶119 The dissent again betrays its misunderstanding of the Equal Protection Clause by proclaiming a violation based on "the Legislature boast[ing] that its Milwaukee-area core retention numbers exceeded their statewide core retention numbers."[27] As the majority opinion makes clear, "[h]igh core retention, for instance, can be readily explained by the fact that the Milwaukee-area districts were underpopulated and, of course, a larger portion of the core would be retained."[28] Therefore, the

---

[26] Id. at 8:50 (testimony of Senator Devin LeMahieu (SD 9)).
[27] Dissent, ¶190.

[28] Majority op., ¶51 n.10.

29

districts are not "unexplainable on grounds other than race."[29] Under a least-change approach, as a general rule, people should be moved from overpopulated districts to underpopulated districts. Moving people out of an underpopulated district (thereby reducing core retention) rarely achieves any legitimate redistricting goal under a least-change paradigm.



Congressional District 1 (Enacted 2011)

¶120 The dissent continues to misunderstand Cooper v. Harris, 581 U.S. __, 137 S. Ct. 1455 (2017), despite invoking that case in misplaced support for the dissent's conclusion that the Legislature's maps violate the Equal Protection Clause. Two pictures illustrate the issue in Cooper better than two thousand words could.[30]

---

[29] Id. (quoting Miller v. Johnson, 515 U.S. 900, 913 (1995)).

[30] These images are taken from the opinion in Cooper.



Congressional District 12 (Enacted 2011)

¶121 The United States Supreme Court described Congressional District 1 as "anchored in the northeastern part of the State, with appendages stretching both south and west[.]" Id. at 1456. It described District 12 as "zig-zagging much of the way to the State's northern border." Id. District 1 had a BVAP of 52.7% and District 12 a BVAP of 50.7%. Id. at 1466. Based on direct statements from a North Carolina Senate debate, the Court noted the map drawers had purposefully designed District 1 to hit "the 50%-plus target," which "had a direct and significant impact" on the district's configuration. Id. at 1469 (citation omitted). This change was not necessary because, notwithstanding a lower BVAP, for twenty years District 1 had

31

been "an extraordinarily safe district for African-American preferred candidates." Id. at 1470 (citation omitted).

¶122 District 12 (in its fifth appearance before the United States Supreme Court) was highly suspect. Id. at 1472. The defense of the district was based on it being drawn for partisan advantage rather than in consideration of race. Id. at 1472-73. The United States Supreme Court upheld the district court's finding that race predominated. Notably, the finding was based in part on public statements from relevant officials "that racial considerations lay behind District 12's augmented BVAP." Id. at 1475. Discovery disclosed the VRA was largely used as a shield to justify a racial gerrymander. Id. One congressman testified he had been told by leaders that they "ramp[ed] the minority percentage in [District 12] up to over 50 percent to comply with the Voting Rights Act." Id. at 1476 (second modification in the original). Needless to say, in light of the district court's findings, the United States Supreme Court disdained such attempts to use racial gerrymanders for partisan advantage.

III. USING THE VRA AS A GUISE FOR PARTISAN GERRYMANDERING

¶123 Governor Evers' maps reflect a longstanding practice of using the VRA as a shield to justify partisan gerrymandering. As a proper reading of Cooper confirms, the Constitution prohibits this. Contrary to the dissent's misreading of Cooper, the case establishes why Governor Evers' maps raise serious equal protection problems while the Legislature's maps do not. Although this court does not consider partisan fairness in

32

redistricting, it should be skeptical of VRA claims presented by partisan actors who do not even try to provide evidence sufficient to survive strict scrutiny. See Johnson I, 399 Wis. 2d 623, ¶8 ("[T]he partisan makeup of districts does not implicate any justiciable or cognizable right."). Because Governor Evers "intentionally creates . . . majority-minority district[s], race is necessarily [his] predominant motivation and strict scrutiny is therefore triggered." League of United Latin American Citizens v. Perry, 548 U.S. 399, 517 (2006) (Scalia, J., concurring in judgment and dissenting in part); see Wis. Legislature, slip op., at 3 ("[W]e have held that if race is the predominant factor motivating the placement of voters in or out of a particular district, the State bears the burden of showing that the design of that district withstands strict scrutiny." (citing Cooper, 137 S. Ct. at 1463-64)).

¶124 The Equal Protection Clause may tolerate affirmative action to the extent it can be proven necessary to provide equal opportunity to a racial minority; however, our color-blind Constitution will permit a race-based remedy only if the state actor has strong evidence of this necessity. "In the absence of strong evidence demonstrating a VRA violation will result . . . [without the consideration of race], this court should 'unerringly and unapologetically . . . exalt[] the ideal of individual equality without regard to race.'" Johnson II, 400 Wis. 2d 626, ¶240 (Rebecca Grassl Bradley, J., dissenting) (quoting Robert Redwine, Comment, Constitutional Law: Racial

33

and Political Gerrymandering——Different Problems Require Different Solutions, 51 Okla. L. Rev. 373, 399 (1996)).

¶125 The United States Supreme Court requires strong evidence of voting rights violations before race-conscious remedies may be imposed because "[c]lassifications of citizens solely on the basis of race 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'" Shaw v. Reno, 509 U.S. 630, 643 (1993) (quoting Hirabayashi v. United States, 320 U.S. 81, 100 (1943)). "They threaten to stigmatize individuals by reason of their membership in the racial group and to incite racial hostility." Id. (citing J.A. Croson Co., 488 U.S. at 493 (plurality)). Race-based redistricting "reinforces the perception that members of the same racial group——regardless of their age, education, economic status, or the community in which they live——think alike, share the same political interests, and will prefer the same candidates at the polls." Id. at 647. For this reason, race-based redistricting is antithetical to individual dignity, treating people as nothing more than members of a homogenous group by birth rather than by choice. "[E]ven in the pursuit of remedial objectives, an explicit policy of assignment by race may serve to stimulate our society's latent race consciousness, suggesting the utility and propriety of basing decisions on a factor that ideally bears no relationship to an individual's worth or needs." Id. at 643 (quoting United Jewish Orgs., 430 U.S. at 173). Our national ethos rejects such a practice.

34

¶126 On March 3, when a majority of this court adopted a racial gerrymander based solely on a misapplication of the concept of proportional representation,[31] it endorsed "[t]he use of a mathematical formula" that "tends to sustain the existence of ghettos by promoting the notion that political clout is to be gained or maintained by marshaling particular racial, ethnic, or religious groups in enclaves." See United Jewish Orgs., 430 U.S. at 186 (Burger, C.J., dissenting). "It suggest[ed] to the voter that only a candidate of the same race, religion, or ethnic origin can properly represent that voter's interests, and that such candidate can be elected only from a district with a sufficient minority concentration." Id. That premise reflects a foundational error; equal protection rejects racially proportional representation, which is based on nothing more than stereotypes about how people of a particular race vote.

¶127 Another harm, acknowledged in precedent, is "[t]he message that such districting sends to elected representatives[.]" Shaw, 509 U.S. at 648. "When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely

---

[31] Governor Evers sought to maximize the number of majority-minority districts, not to achieve proportional representation. Nevertheless, the March 3 order ignored basic mathematics and pretended proportionality had been achieved. Johnson II, 400 Wis. 2d 626, ¶238 (Rebecca Grassl Bradley, J., dissenting) ("The Black voting-age population is between 6.1% and 6.5%, as Chief Justice Ziegler explains in her dissent. Wisconsin has 99 assembly seats——not 100——so, even taking the high estimate of 6.5%, the proportional share of Black assembly districts, rounded to the nearest whole number, would be six, not seven (99 × 0.065 = 6.4).").

35

to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole. This is altogether antithetical to our system of representative democracy." Id.; see also Holder, 512 U.S. at 908 (noting the solicitor general had reasoned (improperly), "the Hispanic legislators elected from Hispanic districts in Dade County would represent, not just the interests of the Dade County Hispanics, but the interests of all the Hispanics in the State" (citation omitted)). "The 'black representative's' function" is not "to represent the 'black interest'" but to represent her entire constituency. Holder, 512 U.S. at 907 (citing Shaw, 509 U.S. at 650).

¶128 Race-based redistricting places people in a political echo chamber of sorts, encouraging them to see themselves and their circumstances as little more than the product of race and inhibiting their interaction with other races. "Racial gerrymandering strikes at the heart of our democratic process, undermining the electorate's confidence in its government as representative of a cohesive body politic in which all citizens are equal before the law." Ala. Legis. Black Caucus v. Alabama, 575 U.S. 254, 283 (2015) (Scalia, J., dissenting). As Justice Douglas wrote in a famous dissent:

> When racial or religious lines are drawn by the State, the multiracial, multireligious communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race or to religion rather than to political issues are generated; communities seek not the best representative but the best racial or religious partisan. Since that system is at war with the democratic ideal, it should find no footing here.

36

Wright v. Rockefeller, 376 U.S. 52, 67 (1964) (Douglas, J., dissenting). "[S]eparate but better off" is as legally and morally flawed as "[s]eparate but equal." Id.

¶129 Another problem underlying race-based redistricting sometimes draws little attention: "[A] purportedly preferential race assignment may in fact disguise a policy that perpetuates disadvantageous treatment of the plan's supposed beneficiaries." Shaw, 509 U.S. at 643 (quoting United Jewish Orgs., 430 U.S. at 172 (Brennan, J., concurring in part)). In this case, prominent members of minority communities warned that Governor Evers' maps, regardless of intent, would harm their communities. "At a minimum," this court must give "careful consideration" to the "operation of any racial device, even one cloaked in preferential garb." United Jewish Orgs., 430 U.S. at 173. "[I]f any judicial detection of truly benign policies proves impossible or excessively crude, that alone might warrant invalidating any race-drawn lines." Id.

¶130 Had Governor Evers' assembly map stood, Black voter influence likely would have suffered. Spreading Black voters across seven districts each with almost exactly 50% BVAP would have reduced "black influence" in numerous other districts. Johnson II, 400 Wis. 2d 626, ¶237 n.44 ("[I]f the number of minority-majority districts is maximized, then it necessarily follows that black influence is elsewhere minimized, which reduces the number of districts in which blacks, fully participating in an integrated process, can hold the balance of power." (quoting In re Apportionment of the State Legislature——

37

1992, 486 N.W.2d 639, 654 n.66 (1992)).  For example, if two districts both have 100 people of voting age, including 40 Black people, and are able to elect Black-preferred candidates, taking half the BVAP from one (20 Black people) and swapping them for an equal number of White people of voting age in the other (20 White people) would create a 60% BVAP in one district and a 20% BVAP in the other.  Because the two districts were already electing Black-preferred candidates, the swap just diminishes Black influence in one district, thereby obstructing the Black community in that district from electing candidates of its choice going forward.  The change produces a net loss for the Black community.

¶131 Even if the VRA would actually require drawing seven Black majority districts with almost exactly 50% BVAP each, Governor Evers' maps were not a proper remedy.  The entire premise of the VRA is that past and present racism suppresses minority voting, producing low voter turnout.  For this reason, federal courts always draw remedial majority-minority districts well above 50%——often in excess of 60%.  See, e.g., Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections, 835 F. Supp. 2d 563, 582 (N.D. Ill. 2011) ("60 percent of voting-age population is reasonably required to ensure minorities a fair opportunity to elect a candidate of their choice."); Hastert v. State Bd. of Elections, 777 F. Supp. 634, 647 (N.D. Ill. 1991) (noting that a "65% minority population [or 60% minority voting-age population] concentration [is] generally regarded as necessary to ensure minorities a reasonable opportunity to

38

control a district"); Baumgart, 2002 WL 34127471, at *5 (recognizing expert testimony that "a minority district requires an African-American voting age population of at least 60% to guarantee the election of candidates of choice"). With BVAP hovering just above 50% in each district, if the districts were not already performing, Governor Evers' maps would not have resulted in Black people electing candidates of their choice.

¶132 Governor Evers' "maps actually reduce the percentage of African-American voters in the relevant districts from their existing levels." Johnson II, 400 Wis. 2d 626, ¶107 (Ziegler, C.J., dissenting). That is an odd way of counteracting an "allegedly overpowered . . . white majority[.]" Id. "The remedy is to cure the suppressed voter effect by giving minority voters greater voice, not reducing their voice." Id. In other words, if the districts were not performing, reducing their BVAP would exacerbate the disparity.

¶133 The VRA has a long history of being misused in the exact way Governor Evers would apply it. In 2011, Republicans in North Carolina, purportedly under the guise of VRA compliance, drew maps in much the same manner Governor Evers did. Michael Kent Curtis, Using the Voting Rights Act to Discriminate: North Carolina's Use of Racial Gerrymanders, Two Racial Quotas, Safe Harbors, Shields, and Inoculations to Undermine Multiracial Coalitions and Black Political Power, 51 Wake Forest L. Rev. 421, 421 (2016). First, they determined the BVAP on a statewide basis. Id. Then, they drew majority-minority districts with just enough Black people to ensure

39

proportional representation. Id. As one example, one congressional district had a mere 50.7% BVAP. Id. at 423. Critics accused the Republicans of "creatively reading the statutory command of the VRA to require more needless and wasteful (for black voters) majority-black districts and more blacks packed into black district[s.]" Id. at 425. Because "the candidate[s] preferred by black voters [were] already winning by whopping majorities," the creation of majority-minority districts became a tool for partisan gerrymandering instead of VRA compliance. Id. Cooper demonstrates the illegitimacy of this tactic.

¶134 Because political parties may chip away at minority voting power by the packing and cracking of minority communities, all in the name of the VRA, courts must be vigilant. Both packing and cracking demonstrate "how the creation of majority-minority districts might dilute minority influence in surrounding areas and can lead to an overall decrease in support for minority-sponsored legislation[.]" See Damion Waymer & Robert L. Heath, Black Voter Dilution, American Exceptionalism, and Racial Gerrymandering: The Paradox of the Positive in Political Public Relations, 47 J. Black Studs. 635, 644 (2016).

¶135 Before this court endorses a particular form of affirmative action, it should have an idea of whether that remedy will help or harm the intended beneficiary community. The dissent errs by making assumptions unsupported by the record. For all we know, adopting any particular number of

majority-minority districts could dilute the Black vote.  In fact, we have good reason to believe Governor Evers' maps would do exactly that because a plethora of data suggests White voters are not inhibiting the success of Black-preferred candidates. Johnson II, 400 Wis. 2d 626, ¶186 (Roggensack, J., dissenting) ("Milwaukee's history for at least the last ten years is that of crossover voting where white voters help black voters elect candidates of their choice.").[32]  If we were to draw additional Black majority districts, what BVAP should we set?  What BVAP will assure Black voters sufficient success without wasting their votes?  The dissent does not say because it cannot say.

IV.  THE DISSENT'S NEWFOUND DESIRE TO TAKE ADDITIONAL EVIDENCE

> ¶136 To hear their harangues on the eve of the election, one would suppose that the fable of Chicken Little was about to become a truth, and that the sky was actually falling[.]

Peleg W. Chandler, The Morals of Freedom 29 (1844).

¶137 The United States Supreme Court summarily reversed this court's March 3 decision adopting Governor Evers' state legislative maps.  Wis. Legislature, slip op.  Our duty on

---

[32] The dissent acknowledges "Cavalier Johnson just became the first Black person elected to be Mayor of Milwaukee . . . . In 2020, David Crowley became the first Black person elected to be Milwaukee County Executive."  Dissent, ¶207.  The dissent dismisses these elections——like others discarded by the dissent——as somehow "different."  Although inconveniently undercutting the dissent's theory, this evidence is highly probative. Mayor Johnson won by an overwhelming margin, obviously attracting numerous White voters.  Latest Election Results, Elections Comm'n (Apr. 5, 2022), https://city.milwaukee.gov/election/ElectionInformation/Election Results (reporting unofficially Johnson won with 71.51% of the vote)

41

remand is to apply the Court's per curiam opinion. Although we should give the opinion of the United States Supreme Court the same respect we expect lower courts in Wisconsin to give our own opinions, the dissent instead launches an indignant attack on this nation's highest court.[33]

¶138 The summary reversal occurred for a particular reason. As the United States Supreme Court explained, "[s]ummarily correcting the error gives the [Wisconsin Supreme Court] sufficient time to adopt maps consistent with the timetable for Wisconsin's August 9th primary election." Id. at 2. Wisconsin law authorizes candidates to begin circulating nomination papers for that primary on April 15. Wis. Stat. § 8.15(1). The per curiam opinion, undoubtedly by design, facilitates an

---

[33] Rather than admitting its error, the dissent complains the United States Supreme Court created a new legal standard despite the Court's straightforward explanation of longstanding law. Dissent, ¶181 ("Could this court simply explain ourselves further to satisfy the Court's newly voiced standard?" (emphasis added)); id., ¶201 ("The U.S. Supreme Court's decision appeared to set out a new standard for courts to follow in implementing remedial maps, but neither this court nor the parties knew that standard at the time of briefing." (emphasis added)). Of course, the United States Supreme Court does not summarily reverse a state supreme court on the basis of anything other than well-established law, which has been applied correctly by many other courts. The dissent also accuses the United States Supreme Court of creating "further fog[]" in an area of the law the dissent finds "hazy," citing Justice Sotomayor's dissent from the per curiam opinion as support. Id., ¶177 (quoting Wis. Legislature, slip op., at 1 (Sotomayor, J., dissenting)). The dissent rephrases other arguments from Justice Sotomayor's dissent, illustrating its own analysis is not based on the per curiam opinion or the law on which it is grounded.

expeditious resolution of this case so as not to cause unnecessary election chaos or confusion.

¶139 Contrary to the dissent's suggestion, this court cannot take more evidence at this point: maps are needed immediately. Also contrary to the dissent's ad hominem criticisms of the majority, this court has not taken any "shortcuts"[34] nor has the majority "willfully shut[] its eyes and ears to critical information."[35] As the majority opinion explains, this court has spent an extraordinary amount of resources on this case. The dissent's suggestion to reopen the record to let Governor Evers present new evidence, followed by each party submitting its own (and perhaps competing) evidence, followed by even more briefing, would send this court on an "odyssey" even more lamentable than the one the dissent decries.[36] Unlike Odysseus, however, this court simply cannot

---

[34] Id., ¶161 ("Throughout that first stage in this epic journey, we took what some thought to be a shortcut by foregoing a full-blown adversarial fact-finding trial to test whether race-based bloc voting would trigger the Voting Rights Act of 1965 (VRA)."). The dissent does not disclose the identity of "some who thought" this. As the majority opinion notes, the parties stipulated that no discovery "beyond the exchange of maps, expert disclosures, and any documents or data that a party intends to rely upon or an expert has relied on" was anticipated. Majority op., ¶9. The parties undertook no further discovery. Id. Nor did any party at any point prior to oral argument formally request or move to permit additional discovery. Id., ¶10.

[35] Dissent, ¶182.

[36] Id., ¶157.

43

take 10 years to complete its journey. To quote a more modern source, "[t]he clock's run out, time's up, over, blaow."[37]

¶140 The dissent's suggestion that after receiving the United States Supreme Court's decision on March 23, this court could receive a substantial amount of new evidence, correctly analyze it (after failing to understand the evidence on March 3), and then correctly apply the law to the facts (after failing to understand the law on March 3), all by April 15 is, well, incredible. It took the better part of a year to get to this point, and any rushed attempt to create a race-based remedy would be inappropriate.

¶141 The dissent's desired path is not only inconsistent with the United States Supreme Court's per curiam opinion but with the dissenters' prior positions in this litigation. The three members of the dissent have maintained the view during this case (over the objection of their colleagues) that each party "has one shot or one opportunity[.]"[38] Each party had one shot to engage in discovery.[39] Each party was instructed it had only one opportunity to submit a map. Simultaneously with the release of this decision, the dissenters vote to deny all parties an opportunity to submit new congressional maps maximizing core retention——as they did in January. (The present dissenters did allow Governor Evers, however, to submit new maps with substantive changes.) Johnson, 400 Wis. 2d 626, ¶218

---

[37] Eminem, Lose Yourself (2002).

[38] Id.

[39] Majority op., ¶9.

(Rebecca Grassl Bradley, J., dissenting) ("The Congressmen asked to submit a modified map, but the same majority that now adopts the Governor's modified maps denied the Congressmen this opportunity.").

¶142 The dissenters now seem to project their own actions onto the majority, claiming "the majority of this court continues to bar the submission of any additional evidence from the parties."[40]  Respectfully, it was not this majority that established the one shot rule but a majority that included all three dissenters——over the objection of three members of this majority.  We "continue[]" to bar nothing.

¶143 As a matter of due process, "[t]he Governor's request for special dispensation should fare no better than that of the other parties who have tried to evade the Court's scheduling order with out-of-time submissions."[41]  "Permitting the Governor to submit new evidence is prejudicial to other parties and the Wisconsin voters.  It imposes costs on those other parties and unnecessarily prolongs these proceedings."[42]

¶144 The chance that Governor Evers could even present new evidence sufficient to justify his racial gerrymander is questionable——despite summary reversal, lessons do not appear to have been learned.  In his unsolicited motion to supplement the record, Governor Evers indicated his new expert relied on truncated data, just like other experts in this case.

---

[40] Dissent, ¶189 n.23 (emphasis added).

[41] Legislature's Response Letter Br. at 5.

[42] Id. at 6.

45

Specifically, he said his expert excluded races that were "either not competitive or were uncontested or did not feature white candidates running against Black candidates."[43] Such selectivity is problematic because a performing majority-minority district will have an incumbent who inevitably runs in reelections that are not competitive or are uncontested or do not feature White candidates. To a degree, that is exactly what a VRA remedy is designed to achieve.[44] See Johnson, 400 Wis. 2d 626, ¶¶189-93 (Roggensack, J., dissenting) (summarizing many elections arbitrarily excluded in expert reports).

¶145 In other cases involving elections, the dissenters demurred to taking any action that had the potential to disrupt an election. Any procedural off-ramp is the winning argument. It happened just a few weeks ago. See Teigen v. Wis. Elections Comm'n, No. 2022AP91, unpublished order (Wis. Jan. 28, 2022). And it happened many times before then. Trump v. Biden, 2020 WI

---

[43] Governor Tony Evers' Motion to Supplement the Record at 5.

[44] Governor Evers also told this court in his motion not to consider the election of Earnell Lucas, a Black man, as Milwaukee County Sheriff. Id. at 7. He cites an earlier brief by BLOC as justification, which stated, "this contest was unique because of the abnormal level of white crossover voting due to the association of the white candidate, Schmidt, with controversial former sheriff David Clarke." BLOC's Br. at 29. Sheriff Clarke, also a Black man, was elected four times before retiring from the position. There is no logical explanation for why this court would disregard a data point related to White crossover voting on the theory that the level of White crossover voting was abnormally high. Again, this selectivity serves only to skew the evidence. Of course when numerous counterexamples are discarded, Milwaukee appears to have racial bloc voting, but pseudo-scientific data manipulation cannot survive strict scrutiny.

46

91, ¶3, 394 Wis. 2d 629, 951 N.W.2d 568 (applying laches to dispose of 3 of 4 election challenges); id., ¶140 (Rebecca Grassl Bradley, J., dissenting) ("Once again, the majority of the Wisconsin Supreme Court wields the discretionary doctrine of laches as a mechanism to avoid answering questions of law the people of Wisconsin elected us to decide. Although nothing in the law compels its application, this majority routinely hides behind laches in election law cases no matter when a party asserts its claims."); Hawkins v. Wis. Elections Comm'n, 2020 WI 75, ¶10, 393 Wis. 2d 629, 948 N.W.2d 877 (per curiam) ("Even if we would ultimately determine that the petitioners' claims are meritorious, given their delay in asserting their rights, we would be unable to provide meaningful relief without completely upsetting the election."); id., ¶85 (Rebecca Grassl Bradley, J., dissenting) ("Ironically, the majority in this case adopts the mantra of the Wisconsin Elections Commission, caving to its fearmongering invocation of 'chaos' should the court dare to right this wrong."). This time, the dissenters would readily invite chaos and disrupt an election, the per curiam opinion of the United States Supreme Court notwithstanding. One wonders why.

## V. CONCLUSION

¶146 [T]here is good reason for state and federal officials with responsibilities related to redistricting, as well as reviewing courts, to recognize that explicit race-based districting embarks us on a most dangerous course. It is necessary to bear in mind that redistricting must comply with the overriding demands of the Equal Protection Clause.

De Grandy, 512 U.S. at 1031.

47

¶147 The dissent fails to understand the dangerous voyage on which it would embark. As a California judge recently wrote, "[w]hen faced with a problem, the immediate temptation is to employ the most obvious and direct solution. In most cases, it isn't even fair to call this impulse a 'temptation.' It's just a normal and sound approach to life." Crest v. Padilla, No. 20 STCV 37513, unpublished slip op., at 1 (L.A. Cnty. Superior Ct. Apr. 1, 2022). Although the dissent acknowledges a lack of evidence sufficient to justify affirmative action,[45] it still senses the problem exists, and it deeply wants to address this uneasy feeling head-on. In many other contexts, a head-on approach would be ideal, "[b]ut sometimes there are constraints which call for additional care. This is one of those times." Id.; see also id. at 2 ("The difficulty is that the Legislature is thinking in group terms. But the California Constitution protects the right of individuals to equal treatment. Before the Legislature may require that members of one group be given certain board seats, it must first try to create neutral conditions under which qualified individuals from any group may succeed.").

¶148 "There's always a siren, singing you to shipwreck." Caitlin R. Kieran, The Drowning Girl 101 (2012). In this case, the dissent responds to the smooth-sounding siren of racial classifications, a siren whose danger often becomes apparent only upon close examination. "[I]f we're lucky we're Odysseus

_____

[45] Dissent, ¶196 ("[W]e cannot definitively say the Gingles preconditions are satisfied.").

48

tied up to the ship's mast, hearing the song with perfect clarity, but ferried to safety by a crew whose ears have been plugged with beeswax.  If we're not at all lucky, we're another sort of sailor stepping off the deck to drown in the sea." Id. At least for now, this court safely tethers its opinion to the constitutional command of color-blindness.

¶149 Based on the record before this court, we have an obligation to proceed in a color-blind manner.  The Constitution compels it.  See generally Michael B. Rappaport, Originalism and the Colorblind Constitution, 89 Notre Dame L. Rev. 71 (2013); see also Appendix to the Pennsylvania Legislative Record XCIX (1867) (statement of Rep. John Mann), as quoted in Randy E. Barnett & Evan D. Bernick, The Original Meaning of the Fourteenth Amendment 333 (2021) ("I do not see how it is possible for human wisdom to frame a more perfect amendment to the Constitution of the United States than this section. . . .  [I]t aims to make every court in the United States what justice is represented to be, blind to the personal standing of those who come before it.  Its adoption will prohibit any judge in any State from looking at . . . the color of the skin, of any person coming before him." (emphasis added)).  The only race neutral maps are the Legislature's.  I therefore join the majority opinion in adopting them.

¶150 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice PATIENCE DRAKE ROGGENSACK join this concurrence.

49

¶151 BRIAN HAGEDORN, J. *(concurring).* The United States Supreme Court has determined that in adopting remedial maps, this court needed to conduct a detailed, fact-specific Voting Rights Act (VRA) analysis——in effect, requiring a full adjudication of a VRA claim. We are obligated, the Court said, to examine the record and determine "whether a race-neutral alternative that did not add a seventh majority-black district would deny black voters equal political opportunity." Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct 1245, ___, 2022 WL 851720, at *4 (2022) (per curiam). Absent such evidence, the Court held, a race-conscious remedy may not be employed.[1] Id.

¶152 As our previous opinion expressed, a majority of this court did not understand itself to be adjudicating a VRA claim. Johnson v. Wis. Elections Comm'n, 2022 WI 14, ¶41 n.24, 400

---

[1] Members of the United States Supreme Court have commented that understanding and applying the requirements of the VRA to redistricting is a challenging and confusing enterprise. Merrill v. Milligan, 142 S. Ct. 879, 882 (2022) (Kavanaugh, J., concurring) (order granting stay) (stating "the Court's case law in this area is notoriously unclear and confusing"); id. at 883 (Roberts, C.J., dissenting) (noting "considerable disagreement and uncertainty regarding the nature and contours of a vote dilution claim"). This is made doubly difficult because dangers abound no matter which direction one turns. The Fourteenth Amendment's Equal Protection Clause prohibits race-motivated actions in most circumstances. Maps where voters are sorted on the basis of race "are by their very nature odious." Shaw v. Reno, 509 U.S. 630, 643 (1993) (quoting another source). Yet the VRA——justified under § 2 of the Fifteenth Amendment——has been held to require race-motivated district drawing under certain circumstances. South Carolina v. Katzenbach, 383 U.S. 301, 308 (1966); Cooper v. Harris, 137 S. Ct. 1455, 1470 (2017). Applying these standards is made more problematic when, following the failure of the political process, a court is the map-drawer in the first instance (as is the case here). The briefing in this case reflected this considerable confusion.

1

Wis. 2d 626, 971 N.W.2d 402. Had we understood our task this way, this court likely would have taken a different approach to this litigation. Our process of choosing from among a discrete group of proposals——a method recommended by several parties——was a poor vehicle for conducting the kind of VRA analysis the Supreme Court indicates we should have done. We did not approach record-development with an eye toward resolving factual disputes, making intensely localized factual findings, or receiving an adversarial, district-by-district analysis of every proposal. In other words, we did not conduct the sort of fact-specific inquiry and analysis that one sees in federal VRA cases because we did not view our role as adjudicating a full-blown VRA claim. To be sure, we attempted to comply with all relevant laws——much as a legislature drawing maps in the first instance would——and therefore sought input and briefing. But we anticipated further litigation involving a fully developed Equal Protection or VRA claim could, and likely would, follow.[2]

---

[2] Our opinion explained:

> To be clear, this case does not involve a claim under the Equal Protection Clause or VRA. Rather, as remedial map-drawers, we strive to act in compliance with the Constitution and applicable federal laws necessarily relying on the more limited record before us. A standard VRA claim is brought after the adoption of new districts. Such a claim would proceed much differently, requiring a fully developed factual record and detailed findings regarding the performance of specific districts.

Johnson v. Wis. Elections Comm'n, 2022 WI 14, ¶41 n.24, 400 Wis. 2d 626, 971 N.W.2d 402.

2

¶153 With this in view, complying with the directive of the United States Supreme Court at this stage of the proceedings raises some difficult challenges. Most notably, our record is, at best, incomplete. One solution could be to develop a fuller record, make factual findings, and adjudicate a VRA claim with a firmer factual foundation. But the timing does not work. It would undoubtedly require delaying statutory deadlines and otherwise disrupting the administration of the fall elections. The window of opportunity to conduct a fresh trial with new evidence, new briefing, and potentially new arguments is well past. Supplementing the record would pose the same logistical challenges. For better or worse, the only reasonable course I see is selecting a map based on the record we have.

¶154 An additional difficulty with the path the Supreme Court tells us to pursue is determining what "race-neutral alternative" should serve as the baseline from which to evaluate whether the VRA requires a race-conscious remedial alteration. We cannot use the 2011 maps enacted into law. Those are now unconstitutionally malapportioned and contained at least some race-conscious districts. See Baldus v. Members of Wis. Gov. Accountability Bd., 849 F. Supp. 2d 840, 854-58 (E.D. Wis. 2012). We could construct one ourselves or with the assistance of an expert, but time and our institutional limitations make that unrealistic at this juncture. The remaining option is to choose one of the proposed maps we received as the baseline. Only one proposal was represented as race-neutral in its construction: the maps submitted by the Legislature.

3

¶155 Therefore, as I understand our charge, the United States Supreme Court asks us to start with a baseline race-neutral map—the Legislature's proposal constituting our only feasible option. Then we must determine whether that map contains a VRA violation. If a violation exists, a race-conscious remedy may be crafted. If no violation is established, race-conscious alterations to district lines are impermissible. As the majority explains, the record, such as it is, does not sufficiently support the conclusion that the Legislature's maps violate the VRA. Perhaps a court deciding a VRA challenge on a more complete record would reach a different result. But I cannot conclude a violation is established based on the record we have before us. That means that in light of the Supreme Court's clarified instructions, the Legislature's state senate and state assembly maps are the only legally compliant maps we received.

¶156 For these reasons, I join the majority opinion.

4

¶157 JILL J. KAROFSKY, J. *(dissenting)*. This case has been nothing short of an odyssey——a long wandering marked by many changes in fortune. Like all odysseys, the travelers (this court) have had to make several navigational decisions along the way; unfortunately, we have taken numerous wrong turns. The sum total of all that misdirection now leads us to the legally unacceptable maps submitted by the Legislature.

¶158 Our initial miscalculation was embarking on this journey in the first place, when a majority of this court granted the petitioners' original action petition. I joined the dissent from that grant because of the numerous "reasons for preferring a federal forum," not least of which was that this court had "no experience in drawing district maps." Johnson v. Wis. Elections Comm'n, No. 2021AP1450-OA, unpublished order at 16, 18 (Wis. Sept. 22, 2021, amended Sept. 24, 2021) (Dallet, J., dissenting).

¶159 Once the political process reached an impasse——the legislature failing to override the governor's veto of its proposed maps——the court wandered astray following the sirens' call of "least change." Although rhetorically appealing, this "least change" approach served only to entrench the prior——and blatantly partisan——district maps. I once again joined the dissent as "least change" had "potentially devastating consequences for representative government in Wisconsin." Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶88, 399 Wis. 2d 623, 967 N.W.2d 469 (Dallet, J., dissenting).

1

¶160 The anticipated pitfalls of "least change" came to fruition throughout this long trip as it became apparent that it was "unmoored from any legal requirement for redistricting" and "could not offer an explanation for the tradeoffs and discretionary decisions that are intrinsic to map-drawing." Johnson v. Wis. Elections Comm'n, 2022 WI 14, ¶58-59, 400 Wis. 2d 626, ___ N.W.2d ___ (Ann Walsh Bradley, J., concurring). Although "least change" set our sails in the wrong direction, in our sojourn to adopt maps acceptable for a non-political court, we eventually made landfall on the Governor's maps, which adhered best to that metric.

¶161 Throughout that first stage in this epic journey, we took what some thought to be a shortcut by foregoing a full-blown adversarial fact-finding trial to test whether race-based bloc voting would trigger the Voting Rights Act of 1965 (VRA).[1] But rather than take us to the oasis and end our odyssey, the supposed shortcut only led us to more peril: a collision at the shores of the U.S. Supreme Court's emergency docket. Following an unprecedented summary reversal we find ourselves again adrift.

¶162 In the wake of the Court's reversal, we face another choice of diverging courses forward: (1) invite further briefing and fact finding on the unsettled VRA questions; (2) invite an expert or the parties to submit redrawn, race-neutral maps for the Milwaukee area as Milwaukee includes the only race-based districts; (3) invite an expert or the parties

---

[1] 52 U.S.C. § 10101(a).

2

to submit a whole new, reliably-race-neutral map; or (4) choose another map created by the same flawed process as the Governor's maps. A majority of this court sets sail along option 4——the Legislature's maps——sending us careening over the waterfall.

¶163 We are careening over the waterfall because the Legislature's maps fare no better than the Governor's under the U.S. Supreme Court's rationale. If, according to the U.S. Supreme Court, the Governor's addition of a Milwaukee-area majority-minority district evinces a disqualifying consideration of race, then the Legislature's removal of a Milwaukee-area majority-minority district reveals an equally suspect, if not more egregious, sign of race-based line drawing. In addition, if a further-developed record is required to definitively determine whether the Governor's seventh majority Black district is required then a further-developed record is also required to definitively determine that the Legislature's removal of a majority-minority district does not violate federal law. The Court indicated that in a case like this where the court sits as the map-drawer in the first instance, the court, rather than the parties, are responsible for showing that the number of majority-minority districts required by the VRA constitutes the narrowly tailored remedy allowed under the Fourteenth Amendment's Equal Protection Clause.[2] In choosing the Legislature's maps the majority repeats this court's reversible mistake by again failing to implement fact-finding procedures

---

[2] U.S. Const. art. XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws.").

conducive to addressing the relevant issues under both the VRA and the Equal Protection Clause.

¶164 The majority's reversible error begins with its willful silence on Milwaukee's history of segregation and racial disparity. I start with that history because it is vital to appreciating why both the Equal Protection Clause and the VRA drive this controversy. I then turn from how that history of segregation and racial disparity interacts with federal anti-discrimination law to how that interaction should inform our response to the U.S. Supreme Court's decision. Namely, that response must include a process to develop the record so we can say with certainty how many majority-minority districts the VRA requires. Yet that is not the majority's response at all, and so I conclude by explaining how, without that process, the Legislature's maps must also fail.

I.  MILWAUKEE'S HISTORY OF RACIAL SEGREGATION AND DISPARITY AND FEDERAL ANTI-DISCRIMINATION LAW

A.  A History of Racial Segregation and Disparities

¶165 From the outset, the crux of this redistricting controversy has been the long history of racial discrimination in and around Milwaukee that perpetuates the current racial disparities affecting Milwaukee's minority communities—particularly its Black communities.[3] The 2020 census data shows

---

[3] The statistics and claims set out in this discussion were presented in University of Wisconsin (and former Duke University) Professor David Canon's expert report. See App. to Merits Br. of Intervenor-Pet'rs Black Leaders Organizing for Communities et al. (BLOC) (Dec. 15, 2021).

4

that people who identify as Black or African American, either alone or in combination with other races or ethnicities, make up 7.7 percent of Wisconsin's population. See U.S. Census Bureau, Wisconsin State Profile, https://www.census.gov/library/stories/state-by-state/wisconsin-population-change-between-census-decade.html. Milwaukee County contains by far the highest concentration of Black residents at 28.7 percent. Id. Shamefully, Wisconsin routinely ranks as one of the most racially disparate states in terms of housing, incarceration, education, income, and even infant mortality rates between Black and White residents.

¶166 Those disparities result, in part, from Milwaukee's egregious history of race-based housing discrimination. Dating back to at least the 1930s, the Home Owners' Loan Corporation (HOLC) created color-coded "residential security" maps that identified neighborhoods by their investment risk level.[4] A neighborhood coded "red" denoted the highest risk category, meaning residents in red neighborhoods could almost never obtain mortgages. This practice, referred to as "redlining," was explicitly tied to race. The HOLC would give higher rankings to neighborhoods that excluded racial minorities through restrictive covenants——private contractual agreements that ran with the land and prohibited future property owners from selling

---

[4] See Leah Foltman & Malia Jones, Univ. of Wis. Applied Population Lab, How Redlining Continues to Shape Racial Segregation in Milwaukee, WisContext (Feb. 28, 2019), https://www.wiscontext.org/how-redlining-continues-shape-racial-segregation-milwaukee.

5

or leasing property to non-Caucasian people. HOLC coded neighborhoods with racial minorities "red" and therefore members of those neighborhoods were blocked from financing necessary for homeownership. By the 1940s, 16 of the 18 Milwaukee County suburbs used racially restrictive covenants to exclude Black residents which segregated Milwaukee's Black population in concentrated geographic areas.[5] Though in 1948 Shelley v. Kraemer[6] declared racially restrictive covenants unconstitutional, they continued to be used and recorded until further banned by the 1968 Fair Housing Act.[7]

¶167 The effects of this abhorrent history persist; Milwaukee remains the most racially segregated city in the nation and has the seventh-lowest rate of Black homeownership.[8] As recently as 2015, the U.S. Department of Housing and Urban Development settled a case of racial redlining in Milwaukee against Associated Bank (the largest such settlement to that date).

---

[5] See Lois M. Quinn, Racially Restrictive Covenants: The Making of All-White Suburbs in Milwaukee County (1979).

[6] 334 U.S. 1 (1948).

[7] Although banned, many restrictive covenants remained on the books as an obvious signal to minority populations that they were not welcome in White neighborhoods, thus perpetuating the history of segregation. See Quinn, supra note 5. Some racially restrictive covenants remain on the books today. Debbi Conrad, Do You Have a Racist Deed?, Wis. Real Est. Mag., Mar. 2021, at 7, https://www.wra.org/WREM/Mar21/RacistDeed/.

[8] Elissa Suh, Black Homeownership in the U.S., Policygenius (Dec. 1, 2020), https://www.policygenius.com/mortgages/black-homeownership-rates/#black-homeownership-stats-by-metro-area.

¶168 Racial disparities in education also persist. Many of Milwaukee's schools are "hypersegregated," meaning students of color make up at least 90 percent of enrollment. In fact, the number of Black students in Milwaukee County that attend a hypersegregated school has been increasing in recent years, culminating in an almost identical percentage currently attending hypersegregated schools as did in 1965.[9] This contributes to Wisconsin's high racial disparities in education. We have the largest gap between high school graduation rates for Black students (71.4 percent) and White students (93.8 percent) of any state.[10]

¶169 As can be expected, such disparities in education lead to disparities in employment. The unemployment rate for Black Wisconsinites in 2020 was almost three times that of White Wisconsinites.[11] Wisconsin has the largest gap in median household income and the highest disparity in the poverty rate between Black and White residents in the entire country. Black

---

[9] Marc V. Levine, Univ. of Wis.-Milwaukee Ctr. for Econ. Dev., The State of Black Milwaukee in National Perspective: Racial Inequality in the Nation's 50 Largest Metropolitan Areas. In 65 Charts and Tables 72 (2020). Milwaukee has the highest percentage of Black students attending hypersegregated schools of any major metropolitan area at over 70 percent.

[10] National Center for Education Statistics, Common Core of Data, Table 1: Public High School 4-Year Adjusted Cohort Graduation Rate (ACGR), by Race/Ethnicity and Selected Demographic Characteristics: School Year 2018-19, https://nces.ed.gov/ccd/tables/ACGR_RE_and_characteristics_2018-19.asp.

[11] U.S. Bureau of Labor Statistics: Employment status of the civilian noninstitutional population by sex, race, Hispanic or Latino ethnicity, and intermediate age, 2020 annual averages, https://www.bls.gov/lau/ex14tables.htm.

residents see disproportionately high eviction rates which are tied to a higher homeless population.

¶170 Relatedly, Milwaukee's Black residents also experience discrepancies in healthcare and life expectancy. Wisconsin has the highest infant mortality rate in the country for Black infants while the White infant mortality rate hovers just below the national average.[12] Milwaukee County also showed racial disparities in the impact of COVID-19 with minorities seeing higher rates of infection, hospitalization and death.[13]

¶171 Racial disparities in our criminal justice system are similarly abominable. Wisconsin incarcerates Black residents at the highest rate in the nation——2,742 per 100,000 Black residents are in prison versus the national average of 1,240 per 100,000 Black residents. Our incarceration rate of Black residents is 11.9 times that of White residents. And while 7.7 percent of Wisconsin's population identifies as Black, Black residents make up an egregiously disproportionate 42 percent of our prison population. [14]

---

[12] Colin Gordon, Univ. of Iowa & Iowa Pol'y Project, Race in the Heartland: Equity, Opportunity, and Public Policy in the Midwest 14 (2019) https://files.epi.org/uploads/Race-in-the-Midwest-FINAL-Interactive-1.pdf.

[13] Wis. Dep't of Health Servs., COVID-19: Racial and Ethnic Disparities, https://www.dhs.wisconsin.gov/covid-19/disparities.htm (last updated Jan. 20, 2022).

[14] See Ashley Nellis, The Sent'g Project, The Color of Justice: Racial and Ethnic Disparity in State Prisons 6-7, 10, 20 (Oct. 13, 2021), https://www.sentencingproject.org/publications/the-color-of-justice-2016-report/.

¶172 This history of segregation and racial disparity in Milwaukee restricts Black communities from the opportunity to fully participate in the political process. In the redistricting context, racial gerrymandering is discussed in terms of packing and cracking voters. Packing occurs when the map lines place large numbers of one racial minority into few districts so that they might have as few representatives as possible. Cracking occurs when the map lines spread small numbers of the remaining minority population across many districts so that their influence within those districts is minimal. This is often achieved by drawing districts in funny shapes that wind between neighborhoods to pick up the high number of minority people required to pack districts. In Milwaukee, however, such obvious racial gerrymandering is not needed; historical racial segregation already packs Black communities into concentrated neighborhoods that require little in the way of creative lines to dilute their influence at the voting booth. I will refer to this as a "historical racial gerrymander."

### B. Federal Anti-Discrimination Law

¶173 The VRA's application in redistricting is designed to remedy precisely these kinds of historical wrongs——those that create current barriers to democratic participation. Instead of allowing the past unconstitutional practices of redlining and racially restrictive covenanting to continue limiting Black people's opportunity to participate in our democracy, the VRA establishes that it is a sufficiently compelling government

9

interest to draw districts that counteract the historical racial gerrymander. Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. ___, 142 S. Ct 1245, 1248 (2022) (per curiam).

¶174 We must, of course, also consider the Fourteenth Amendment's Equal Protection Clause. And in doing so, it is impossible to ignore the 180-degree turn from that clause's purpose to how it has been wielded in this case. Ratified in 1868 after the Civil War, the Fourteenth Amendment demands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." Since Brown v. Board of Education,[15] the Equal Protection Clause has been invoked to desegregate this country, protect the voting rights of its citizens, and fight discrimination in its many forms.

¶175 More recently, the Equal Protection Clause has been turned on its head and used, not to fight against the constant pull of our collective historical failing toward the promise of a better future, but to bar our government's ability to remedy past mistakes. See, e.g., Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701 (2007). The majority opinion perfectly captures this reversal by relying on cases pontificating that "[r]acial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions," and that "[r]ace-based assignments . . . embody stereotypes that treat individuals as the product of their race[.]" Majority op., ¶24 (quoting Shaw v. Reno, 509 U.S. 630, 657 (1993), and Miller v. Johnson, 515 U.S. 900, 911-12 (1995)). This argument

---

[15] 347 U.S. 483 (1954).

is nothing short of gaslighting, seemingly denying Milwaukee's history of purposeful racial segregation. It was unrelenting overt racial discrimination that balkanized Milwaukee into "competing racial factions" and reduced Black individuals to a "product of their race." The fault and responsibility to remedy this systemic segregation lies not with Milwaukee's residents but instead with the government and the society that perpetuated racial redlining and restrictive covenants. Those practices shaped Milwaukee and that history of discrimination cannot be undone by force of will alone.

¶176 The Milwaukee area perfectly demonstrates why the VRA's race-conscious remedy is often needed. Segregation of minority communities does not happen accidentally. If this country were anywhere close to living up to the "goal of a political system in which race no longer matters," then maybe we could apply the promise of Equal Protection in a race-blind manner. See Shaw, 509 U.S. at 657. But the overwhelming evidence shows that we have not lived up to that goal. As such, a race-blind and effects-blind application of the Equal Protection Clause has become a sword against progress wielded by majority groups who fear giving away too much of their accumulated power. I fervently hope it will regain its place as a shield against harmful discriminatory action.

## II. THE CORRECT RESPONSE: DEVELOP THE RECORD

¶177 According to the U.S. Supreme Court, we erred in our prior decision by misapplying the test in Cooper v. Harris that calls for a "strong basis in evidence" in order to determine

11

whether "good reason" existed to believe the VRA required seven Black majority districts. Wis. Legislature v. Wis. Elections Comm'n, 142 S Ct at 1249-50 (citing Cooper v. Harris, 581 U.S. ___, 136 S. Ct. 2512 (2017)). The Court directs that we are to ask "whether a race-neutral alternative that did not add a seventh majority-black district would deny black voters equal political opportunity." Id. at 1250-51. Yet in attempting to correct our course through a "hazy at best" sea of federal law, id. at 1251 (Sotomayor, J., dissenting), the Court has only further fogged how a court in this posture (drawing the map in the first instance) should balance the VRA and the Equal Protection Clause.

¶178 Prior to the Court's decision, an Equal Protection analysis began with whether "race was the predominant factor motivating the [map-drawer]'s decision to place a significant number of voters within or without a particular district. That entails demonstrating that the [map-drawer] 'subordinated' other factors——compactness, respect for political subdivisions, partisan advantage, what have you——to 'racial considerations.'" Cooper, 137 S. Ct. at 1463-64. Yet, the Court's opinion did not first analyze whether race was the "predominant factor" motivating this court's districting decisions. Instead, it appeared that the Court took this court's limited analysis regarding the VRA, meant only to ensure the least-change map did not violate that law, as evidence that race——not least change—— predominated our choice of maps. Our March 3 opinion never professed as much.

12

¶179 While the U.S. Supreme Court's opinion said it was unclear whether this court viewed itself or the Governor as the map-drawer, we plainly stated that the court itself was the map-drawer. See Johnson, 400 Wis. 2d 626, ¶10 ("As a map-drawer, we understand our duty is to determine whether there are 'good reasons' to believe the VRA requires a seven-district configuration.").[16] The lack of clarity the Court points to actually relates to an unsettled point of Equal Protection jurisprudence: when a court adopts a party-submitted map, whose motivation is being analyzed under the Equal Protection Clause, the court's or the party's?

¶180 Despite our clear declaration that "least change" predominated our choice of maps, and despite the purported purpose of "least change" as a neutral criterion to shed ourselves of the political baggage that would be inherent in party-drawn maps, the Court nonetheless transposed the Governor's motivations onto this court. We are left to conclude that the motivations of the party submitting the map are the relevant motivations we must analyze going forward. This court can no longer hide behind a "least change" gloss to ignore a party's ulterior motives.

---

[16] Additionally, as the map-drawer we considered all information and analysis from the record collectively and were not limited to the Governor's admittedly scant VRA analysis. Thus, when analyzing the Gingles preconditions and Senate factors, we relied largely on the BLOC interveners' more thorough expert analyses—analyses the Governor explicitly adopted in most respects.

13

¶181 The U.S. Supreme Court left us with other unanswered questions:

- Is the court required to fully address a VRA challenge when selecting a purportedly race-neutral map or have we been given carte blanche to ignore federal law?

- Which race-neutral configuration was the court to use when analyzing the Governor's maps given the myriad potential "race-neutral" district configurations in Milwaukee?

- How do we proceed if the process we adopted prevented the parties from sufficiently testing the evidence necessary for a VRA determination?

- Could this court simply explain ourselves further to satisfy the Court's newly voiced standard?

In light of these uncertainties, and in order to avoid further reversible error, I believe we must implement one of the first three options set out above: (1) invite further briefing and fact finding on the unsettled VRA questions; (2) invite an expert or the parties to submit redrawn, race-neutral maps for the Milwaukee area; or (3) invite an expert or the parties to submit a whole new, reliably-race-neutral map.

¶182 The second and third options appear to be non-starters at this stage as this court has not commissioned a neutral map-drawer or allowed the parties to submit new maps in accordance with the U.S. Supreme Court's decision. As for the first option, which the U.S. Supreme Court explicitly invited, a majority of this court continues to refuse procedures to develop the record, willfully shutting its eyes and ears to critical

information. See Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct at 1251 ("On remand, the court is free to take additional evidence if it prefers to reconsider the Governor's maps rather than choose from among the other submissions."). Conveniently, that same majority now points to the very insufficiency of information it perpetuates as a party's failure to carry its burden of proof.[17] However, it is not the parties' responsibility to implement fair, legal remedial maps——it's ours.

¶183 The majority opinion attempts to shift the blame by noting that the parties stipulated through their joint discovery plan that they did not anticipate discovery "beyond the exchange of maps, expert disclosures, and any documents or data that a party intends to rely upon or an expert has relied upon." But we had the authority, indeed the responsibility, to direct further discovery or examination of expert witnesses. This court's initial reliance on the joint discovery plan was guided by the court's "least change" directive, which failed to account for the full and definitive Equal Protection or VRA inquiry the U.S. Supreme Court now demands. This persistent imprudence in

---

[17] See majority op., ¶32 ("[T]he Governor failed to present evidence that a race-based remedy was necessary under the VRA."); id., ¶57 ("On this record, we cannot agree with the Governor and BLOC that the Legislature's race-neutral proposal would violate the VRA."); id., ¶58 n.11 ("Under the record as it currently exists, we cannot conclude the Gingles prerequisites are satisfied."); id., ¶48 ("No party argued and no evidence was provided demonstrating that the Legislature's maps were, in fact, not race neutral."); id., ¶73 ("[W]e conclude that insufficient evidence is presented to justify drawing state legislative districts on the basis of race.").

15

developing a record has now led us to a legally untenable outcome at odds with the Court's directive. The Equal Protection and VRA claims usually litigated <u>after</u> the implementation of a remedial map must now be fully adjudicated as part of this decision——an impossible task on this record.

¶184 Building that record requires work because remedial redistricting is complicated. It requires a wealth of facts collected through discovery, sworn affidavits, and examination and cross-examination of witnesses and experts. Fairness requires that we test every major change made in a districting map to verify that its motivations comport with those appropriate for a non-partisan court to adopt.[18] This is why most remedial redistricting courts hold multi-day trials and implement court-drawn maps rather than maps selected from party submissions. <u>See, e.g.</u>, <u>Baldus v. Members of Wis. Gov't Accountability Bd.</u>, 849 F. Supp. 2d 840 (E.D. Wis. 2012); <u>Baumgart v. Wendelberger</u>, No. 01-C-0121, 2002 WL 34127471 (E.D. Wis. May 30, 2002) (per curiam). This court, in its hubris and desire to short-circuit a complicated process, thought it knew

---

[18] Although this court has disclaimed a "fair maps" requirement as it relates to partisan gerrymandering by the legislature, it should be beyond dispute that we, as a non-partisan court, cannot implement a map with blatantly partisan motivations. <u>See</u> <u>Johnson v. Wis. Elections Comm'n</u>, 2022 WI 14, ¶93, 400 Wis. 2d 626, ___ N.W.2d ___ (Dallet, J., dissenting). A non-partisan judiciary goes to the very core of democracy and to established principles of separation of powers. Now that the U.S. Supreme Court has declared that the motivations of the party whose map we adopt——partisan or otherwise——are superimposed onto this court, maintaining impartiality in selecting a party-drawn maps requires heightened attention to the reason behind every change in a district's boundaries.

16

better. By both adopting a process that aimed to adopt a party-submitted map despite glaring partisan motivations and limiting the arguments to appellate-style briefs, written expert reports, and oral presentation to this court, we received too thin a record on which to make determinations with absolute certainty.

¶185 But we did not have to do it this way, as dissenters made clear at every point in our voyage. This court could have arranged for proper fact finding and examination of expert witnesses, either in front of all of the Justices or through a referee (sometimes referred to as a Special Master) under Wis. Stat. § 751.09. Now, following the U.S Supreme Court's reasoning in reversing our prior decision, one would think that we have no choice but to actually correct course and develop an appropriate record. Yet the majority is content to make the same two procedural mistakes. It bars proper fact finding and limits itself to our current pool of party-submitted, partisan-motivated maps rather than adopting a process by which we could create a judicially appropriate map.[19] The result, as the next

_____

[19] Without "least change" to shield the court from party motives, all party maps——with the possible exception of the Citizen Mathematicians and Scientists' maps——fail to meet a standard that requires both race-neutrality (as is required under the majority's reasoning) and partisan-neutrality (as is required by the non-partisan nature of this court). But the majority continues to limit itself to the parties' previously submitted maps, concluding that "the Legislature's maps are superior to the available alternatives." Majority op., ¶21. It should go without saying, however, that a less illegal map is still illegal. This posture also ignores that other alternatives could have been made available to this court (for example, through a new round of party submitted maps adhering to the U.S. Supreme Court's decision) but were barred from consideration.

17

section explains, are maps wholly unsuited for any serious court's approval.

### III. THE LEGISLATURE'S MAPS

¶186 The Legislature's maps fail for two reasons: first, we are not to act as a gubernatorial veto override body; and second, the Legislature's maps show evidence of racially motivated packing and cracking that could violate both the Equal Protection Clause and the VRA.

### A. Failed Political Process

¶187 The Legislature's maps derive from a failed political process. In Wisconsin, the redistricting process follows the same process as the enactment of any law. Both houses of the legislature must pass a bill containing new maps, which is then presented to the governor who may approve or veto the bill, the latter of which the legislature may override with a supermajority vote. See Wis. Const. art. IV, § 17 & art. V, § 10. Here, the Legislature, having failed to override the gubernatorial veto, submitted the very same proposal to us. By now implementing that failed bill, this court judicially overrides the Governor's veto, thus nullifying the will of the Wisconsin voters who elected that governor into office. But our constitution provides only one avenue to override such a veto; no judicial override textually exists. See Wis. Const. art. V, § 10. Nor, historically, has this court ever exercised such a supreme power. By judicially enacting the very bill that failed the political process, a bare majority of this court, rather

18

than a supermajority of the legislature, has taken the unprecedented step of removing the process of lawmaking from its constitutional confines and overriding a governor's veto ourselves.

B. Signs of an Equal Protection Violation

¶188 In addition to being derived from a failed political process, the Legislature's maps show signs of violating the Equal Protection Clause. If, as the U.S. Supreme Court explained, the Governor's addition of a majority-minority district sufficed to show that race predominated its proposal, then equally, if not more, suspect is the Legislature's removal of a majority-minority district. Despite the majority opinion's assertions, the Legislature's maps do not appear to be race-neutral and calling the claim "indisputable" does not make it so. The Legislature's claim that it drew its maps without considering race, quite frankly, flies in the face of its transfiguration of Milwaukee's six current districts with a Black voting age population (BVAP) majority.[20] In Milwaukee, the BVAP increased 5.5 percent while the White voting age population decreased 9.5 percent over the last decade. Those demographic changes make the Legislature's draw down of BVAP percentage in five out of six VRA districts——one by over 12 percent——with the

_____

[20] The voting age population, rather than the general population, is the preferred number to review when dealing with voting districts. See, e.g., Cooper v. Harris, 581 U.S. ___, 136 S. Ct. 2512 (2017) (analyzing a VRA claim using BVAP data).

19

remaining VRA district packed at 73.3 percent BVAP highly suspicious.[21]

¶189 This suspicion is not assuaged by the Legislature's expert report. That report sets out how none of the Milwaukee area's Black population was removed from existing VRA districts[22] (there was movement between existing VRA districts) and only 2,046 Black people were added to any VRA district from outside existing VRA districts——1,625 Black individuals were moved from AD24 to AD10 and AD12, and 421 Black individuals were moved from AD13 to AD18. See Wis. Legislature's Br., Expert Report of

---

[21] The Legislature's Assembly District (AD) 10 dropped from 59.4 percent BVAP in 2011 Wis. Act 43 to 47.2 percent; AD12 dropped from 60.6 percent to 57 percent; AD16 dropped from 55.6 percent to 54.1 percent; AD17 dropped from 68.4 percent to 61.8 percent; AD18 dropped from 60.7 percent to 52.6 percent; and, finally, AD11 increased from an already high 65.5 percent to 73.3 percent. See BLOC Resp. Br. 9.

[22] Evidence indicates that when drawing the 2011 district maps the legislature considered race for the purpose of creating six majority-Black districts that would "perform" under the VRA's standards. For example, in briefing for Gill v. Whitford, the State, which was defending the legislatively enacted maps in 2011 Wisconsin Act 43, affirmed that "[t]o comply with the VRA, the staffers paid special attention to Milwaukee's Assembly districts. After [the expert] and the lawyers had signed off on the Milwaukee districts, the staffers 'locked these districts' and then worked on maps of other areas of the State." (internal citations omitted). Br. For Appellants at 14, Gill v. Whitford, 585 U.S. ___, 138 S. Ct. 1916 (2018) (No. 16-1161) (Jul. 28, 2017). Likewise, in briefing for Baldus v. Members of Wis. Gov't Accountability Bd., 849 F. Supp. 2d 840 (E.D. Wis. 2012), defendants represented that "Act 43 shifted the lines of assembly district 12 to encompass additional African American voters, thereby creating a sixth African American Assembly District." Defs.' Br. Supp. Mot. for Summ. J. at 22, Baldus v. Members of Wis. Gov't Accountability Bd., 849 F. Supp. 2d 840 (E.D. Wis. 2012), 2012 WL 7682784 (Feb. 10, 2012).

20

Dr. John Alford 6-7 (Dec. 15, 2021). Collectively, Milwaukee's VRA districts needed to gain approximately 31,921 people to meet the ideal population after the 2020 census. See App. of the Wis. Legislature 18 (Aug. 23, 2021). This means that in adding the required population, approximately 6.4 percent of the people moved into the VRA districts were Black. While this number is reasonably consistent with Wisconsin's Black population percentage as a whole, it is low when compared to the Milwaukee area's percentage Black population. For example, the Legislature's AD23 is above 10 percent Black, AD19 is 7 percent Black, and AD7 is 7.9 percent Black (not including those who identify as more than one race). See Wis. Legislature's Resp. Br., Resp. Expert Report of Dr. John Alford 11 (Dec. 30, 2021). Both AD23 and AD19 were overpopulated and bordered existing VRA districts, but not one person was moved from either of those districts into underpopulated VRA districts. See Wis. Legislature's Br., Expert Report of Thomas M. Bryan 57 (Dec. 15, 2021). Over 7,500 people were swapped between AD7 and other districts (7,622 people were moved from AD7 to AD9 and 7,843 people were moved from AD 13 to AD7) but, likewise, not one person was moved into existing VRA districts. All of this could indicate that the Legislature targeted a certain quota of Black people to move into current VRA districts to keep those districts at "performing" VRA levels, just as they did with the 2011 maps.[23] Importantly, this is precisely the same type of

_____

[23] No direct examination of this kind of circumstantial evidence exists in the record because the procedural posture of this case and the court's "least change" approach did not lend

racial consideration that the U.S. Supreme Court found violated the Equal Protection Clause when done in the Governor's map.

¶190 Moreover, the Legislature boasted that its Milwaukee-area core retention numbers exceeded their statewide core retention numbers. See Wis. Legislature's Reply Br. 11. Rather than bolstering its core retention claims, the fact that Milwaukee contains the highest concentration of minority populations[24] turns this admission into circumstantial evidence that the Legislature impermissibly considered race when deciding who to move between districts. Indeed, upon closer inspection, 16 of the Legislature's assembly districts show a discrepancy of over 10 percent between the district's overall core retention number and the Black-only core retention. And three of those districts (AD22, AD40, and AD92) exhibit a whopping discrepancy of over 35 percent.[25] See Wis. Legislature's Br., Expert Report of Thomas M. Bryan 56-64 (Dec. 15, 2021). Circumstantial evidence such as this can show an Equal Protection Clause violation, despite legislative professions of race-neutrality.

---

itself to a full adjudication of the merits of any Equal Protection or VRA claims. Even after the U.S. Supreme Court reversed because of this type of missing factual development, the majority of this court continues to bar the submission of any additional evidence from the parties.

[24] See U.S. Census Bureau, Wisconsin State Profile, https://www.census.gov/library/stories/state-by-state/wisconsin-population-change-between-census-decade.html.

[25] Expert analysis is needed to decipher what inferences, if any, can be drawn from these statistics, but the discrepancies certainly offer facially substantial reasons to analyze the Legislature's maps and their underlying motivations more fully.

22

See Cooper, 136 S. Ct. 2512 (affirming the district court's findings that racial considerations predominated the drawing of District 12 despite the State's profession that the subject district was drawn based on political data and that racial data was not even viewed by the map-drawer). With such evidence contradicting the Legislature's unsupported professions of race-neutrality, we are duty bound to investigate the actual focus race played in its proposed lines.

¶191 Self-serving professions of race-neutrality should also be ignored because the Legislature offered no alternative reasons for making decisions regarding Milwaukee's districts. The Legislature's "least change" pretext fails when it openly admits its Milwaukee-area changes substantially differed from its treatment of the rest of the state. Nor can the Legislature justify its unique redrawing of Milwaukee districts on a desire to keep municipalities whole; it split at least one relevant village, Brown Deer, by dividing its Black population between two districts. Respecting "communities of interest" also fails to justify the Legislature's actions because no party submitted evidence establishing such communities. That leaves the more nefarious partisan advantage reasoning——a reliable pretext for racial motivations. But a neutral judicial body cannot adopt a map on such a justification, especially now that the party's

23

motives are imputed onto the court.[26]  The Legislature also has not, and could not, claim such a justification as this court barred consideration of partisanship in our redistricting process.  As such, no judicially acceptable justification for the Legislature's Milwaukee-area redistricting decisions exists.

¶192 Finally, the majority fails to address how Milwaukee's two majority-Hispanic districts——ADs 8 and 9——play into their "race-neutral" approach.  According to the Legislature, its "plan keeps intact 100 percent of existing Assembly District 8, more than 90 percent of existing Assembly District 9, and adds new Hispanic population to both Assembly District 8 and 9."  Wis. Legislature's Br. 36 (Dec. 15, 2021).  No VRA analysis as to those districts established that either would require race-based distribution of the population.  Although under this court's original approach, all parties conceded that those districts were appropriate, the U.S. Supreme Court's decision made clear that relying on the parties' concessions cannot support a finding that the VRA required race-based decisions.  Furthermore, while the 2012 Baldus decision set out the borders of those districts based on VRA analysis, that analysis was

---

[26] The majority opinion conflates a political-gerrymandering claim with the uncontroversial concept that a neutral, non-partisan court cannot act in support of purely political interests.  See majority op., ¶51 n.10.  As explained before, Rucho is not at issue in this case.  Rucho v. Common Cause, 588 U.S. ___, 139 S. Ct. 2484 (2019) (holding that claims of partisan gerrymandering stemming from legislatively enacted maps are nonjusticiable).  We, as a court of law, cannot implement blatantly partisan maps.

24

based on the previous decade's information and cannot be carried over wholesale. See Baldus, 849 F. Supp. 2d 840.

## C.  Signs of a VRA Violation

¶193 A majority of this court has already expressed that a plan containing only six majority-BVAP districts "could prove problematic under the VRA." Johnson, 400 Wis. 2d 626, ¶49.  The Legislature's map contains only five majority-BVAP districts, which should give any court pause.  The Legislature's plan leaves a significant number of Black voters dispersed into surrounding majority-White districts where their voting power is thus diluted.  For example, as mentioned above, the Legislature's plan unnecessarily swaps population between AD23 and AD24, cracking Brown Deer's Black voters in the process. Additionally, the evidence above shows that only limited numbers of Black individuals were moved into existing VRA districts to keep them at "performing" levels while the remaining Black individuals were spread into surrounding, non-VRA districts such as AD7, AD19, AD23, and AD24 in insufficient numbers to be considered influential.  This may violate the VRA even if that distribution was not intentionally race-based.

¶194 The VRA's applicability here turns, first, on the three Gingles preconditions, and second, on whether the totality of the circumstances shows the Legislature's lines deny minority voters the equal opportunity to participate in our democracy. Although members of this court have claimed that the three Gingles preconditions are not met in Milwaukee, the bulk of the evidence presented to this court supports the opposite

25

conclusion.  The Legislature itself argued that its proposed map did not violate the VRA because it contained five majority-Black districts and one Black-influence district.  See Wis. Legislature's Br. 33 (Dec. 15, 2021) ("The Milwaukee area has always been an area of concern for the Voting Rights Act.  The Legislature's plans for the Milwaukee area comply with the Voting Rights Act, both for Milwaukee's Black and Hispanic populations.").

¶195 Examining the record we do have, the three Gingles preconditions are likely met in Milwaukee.  And the totality of the circumstances in Milwaukee show that Black voters do not have an equal opportunity to participate in the political process.  Although this court's procedural decisions have barred the kind of tested expert testimony required to make definitive VRA determinations, that lack of evidence cuts both ways.  If we cannot say that seven VRA districts are required, we equally cannot say, based on the evidence before us, that six are required, or that none are required.  The majority nakedly proclaims that "on this record" no VRA violation can be proven, but this proclamation misunderstands our duty here.  A majority of this court failed to adopt procedures that would have allowed the balancing of relevant facts required under the VRA and the Equal Protection Clause.  Because of this failure, the majority opinion cannot fulfill its responsibility and determine what, as a matter of law, is the narrowly tailored remedy required under the VRA.

1.  The Gingles Preconditions

26

¶196 In approaching the Gingles preconditions, only one expert provided the bulk of the past-election analyses required. And those analyses indicate that the Gingles preconditions are met in Milwaukee. However, members of this court, myself included, conclude that the evidence has not been sufficiently tested through a proper adversarial fact-finding process. Consequently, we cannot definitively say the Gingles preconditions are satisfied. This is an act of judicial restraint based on the deficiency of process, not a finding that other facts or expert analysis outweigh the facts and analysis as set out here.

¶197 The first Gingles precondition requires that there be a sufficiently large and compact minority population to constitute a district. See League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 400-01 (2006). The U.S. Supreme Court criticized this court's March 3 analysis on the first precondition because this court deferred to the undisputed nature of the claim. In doing so, the Court failed to acknowledge that the Governor's maps necessarily proved that there is a sufficiently large and compact minority population to constitute seven districts by proposing maps that contain seven contiguous and compact districts, each with over 50 percent BVAP. The Governor's maps, in and of themselves, demonstrate a sufficiently large and compact Black population to constitute seven majority-Black districts. Satisfying the first precondition comes as no surprise given the reality that

27

Milwaukee is one of the most geographically segregated, and therefore racially compact, cities in the country.

¶198 The second and third <u>Gingles</u> preconditions, often discussed together as the need to show "racially polarized voting," were evidenced through an expert analysis of relevant elections. <u>See</u> <u>id.</u> (setting out that the second and third threshold conditions require that "the group must be 'politically cohesive'" and "the white majority must 'vote sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.'"). While one dissent to our March 3 opinion took it upon itself to formulate the only significant alternative analysis of previous elections, the races cited lacked probative value as to the presence of racially polarized voting. The vast majority of the alternative elections involved incumbent candidates running entirely unopposed or involved major party candidates who did not face a major-party opponent in a general election.[27] These types of races are not relevant or informative regarding the question of

_____

[27] The record of candidates running for election comes from state public records and is therefore "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Wis. Stat. § 902.01. Gwen Moore was an established incumbent in her 2016 race and ran against only libertarian and independent candidates; Lena Taylor was an established incumbent in her 2012 race and ran against only an independent candidate; Lena Taylor ran unopposed in her 2016 general election and in 2020; La Tonya Johnson ran unopposed in 2016; and Justice Roggensack's dissent acknowledges that both Leon Young and Jason Fields ran unopposed in their respective races.

racially polarized voting.[28]  Similarly, the majority opinion points to BLOC's lack of analysis of November general elections as a fatal flaw in its analysis of racially polarized voting, but VRA experts often exclude partisan general election data because it is probative only of partisan motives that mask underlying racial discrepancies.  Thus, as one expert explained, in a strongly Democratic-voting district like those in the Milwaukee area, only non-partisan elections and Democratic primaries have the potential to reveal the presence of racially polarized voting.  See BLOC's Br. App. 15 (Dec. 15, 2021).

¶199 That same expert relied on several methods to analyze the raw data surrounding eight such elections.  The analyses all led to the conclusion that racially polarized voting occurred in seven of the eight elections.[29]  Id. at 16.  The single election of the bunch that showed substantial White cross-over voting was the Milwaukee County Sheriff Democratic Primary which featured a candidate, Schmidt, who had served as the second in command to former Sheriff Clarke, a conservative and polarizing political figure.  It is likely that attitudes toward former Sheriff

----

[28] This highly technical analysis is generally performed by an expert subject to cross-examination for the very reason that it is difficult to sift through statistical noise.  Careful selection of relevant and informative past races is key to a reliable "racially polarized voting" analysis.  Again, the majority of this court barred the process needed to ensure such an analysis.

[29] Dr. Collingwood states he used ecological regression, ecological inference, and homogeneous precinct analysis to analyze ward-level vote returns to infer individual-level voting behavior.  He also explains the various programs used to analyze the data.

29

Clarke lessened support for Schmidt, one of two White candidates, and increased cross-over support for the Black-preferred candidate, Lucas. These distorting features mean that race may not be as probative of racially polarized voting as the other seven races. Those remaining races showed BVAP to Black preferred candidate correlation coefficients between .80 and .95, and White voting age population to White preferred candidate correlation coefficients between .55 and .89.[30] These numbers show reliably high correlations between a voter's race and preferred candidate.[31]

¶200 The third Gingles precondition also requires that White bloc voting usually blocks Black voters from electing candidates of choice. This is, undoubtedly, the most difficult part of the analysis in our posture because, under a normal VRA challenge, it would usually require district-specific numbers. In some circumstances, it may not make sense to analyze majority-BVAP districts under this precondition because White voters cannot defeat a Black-preferred candidate so long as

---

[30] The race with the lowest correlation coefficient, the State Superintendent primary with Jill Underly at .55, was low in part due to a split between support for three White candidates. The next lowest correlation coefficient is .68.

[31] Although all of the races analyzed included Black candidates as the Black-preferred candidate and White candidates as the White-preferred candidate, this is not necessarily always the case. A candidate's race does not need to reflect the same race as the minority voting population that prefers them.

voters come out in force.[32] More specific analysis of racially polarized voting in those districts may be relevant, but the outcomes of races in these districts do not indicate whether there is sufficient White-crossover voting to remove the need for race-conscious districting. This is why Dr. Collingwood did not analyze the AD12 Democratic primary election as part of his bloc voting analysis. AD12 is already a majority-BVAP district and so a minority-preferred candidate cannot be blocked by a White majority. Dr. Collingwood did separately find the existence of racially polarized voting in that election. Instead, Dr. Collingwood analyzed elections that cover the Milwaukee area and found that White bloc voting defeats the Black-preferred candidate in four out of seven races for a block rate of 57.14 percent. If the aberrant Milwaukee County Sheriff's election is removed from consideration, that block rate rises to 66.66 percent. This indicates that, in the Milwaukee area as a whole, White bloc voting does usually defeat the Black-preferred candidate.

¶201 The majority opinion points to the lack of "district specific" analysis as another fatal flaw, but, because this case was not a challenge to existing districts, there were no districts to specifically analyze. Thus, the experts worked with what they had and analyzed the Milwaukee area as a whole. The U.S. Supreme Court's decision appeared to set out a new

---

[32] This is not a universal rule as other factors, such as high levels of non-citizen immigrant populations, disenfranchised populations, or populations facing other hurdles to voting could lower a district's minority voting force.

31

standard for courts to follow in implementing remedial maps, but neither this court nor the parties knew that standard at the time of briefing. Yet since the Court voiced that standard, the majority of this court has barred all parties from submitting the necessary additional district-specific analysis of theoretical "race-neutral" maps.[33] That forced ignorance, though, does not erase the evidence we do have, all of which evinces each Gingles precondition.

## 2. Totality of the Circumstances

¶202 Professor David Canon set out a compelling totality-of-the-circumstances analysis showing that Milwaukee's Black voters lack an equal opportunity to participate in the political process. Some of the relevant circumstances, called "Senate Factors," include:

(1) the history of official voting-related discrimination in the state or political subdivision;

(2) the extent to which voting in the elections of the political subdivision is racially polarized;

---

[33] BLOC did analyze the Legislature's proposed AD10. Looking to what Dr. Collingwood described as the "most probative election," the 2018 Democratic gubernatorial primary, the Black-preferred candidate, Mahlon Mitchell, garnered 39.3 percent of the vote while Governor Evers, one of multiple White candidates, received 29.3 percent. The combined vote total of Governor Evers and the next most popular candidate, Kelda Roys, would have defeated Mahlon Mitchell's plurality of votes. This evidence does not appear sufficient to say that AD10 would or would not reliably perform for Black preferred candidates. As explained previously, the Legislature's map is not reliably race-neutral and thus even a full analysis of that map's performance would not satisfy the U.S. Supreme Court's directive to review a race-neutral option.

32

(3) the extent to which the political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group;

(4) the exclusion of members of the minority group from candidate slating processes;

(5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

(6) the use of overt or subtle racial appeals in political campaigns; and

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

According to Professor Canon's unrefuted analysis, all Senate Factors except factor (4) show that Black voters have less of an opportunity to participate in the political process than White voters.

¶203 Wisconsin has a history of both official voting discrimination and voting practices that enhance the opportunity for discrimination (Senate Factors 1 and 3). While history of these practices is no doubt long, relatively recent instances of such practices paint a sufficient picture. First, in 2012, the Baldus court held that the Legislature's redistricting maps unlawfully diluted the voting strength of minority voters in the Milwaukee area. See Baldus, 849 F. Supp. 2d 840. Second, recent attempts to purge voter rolls of "inactive" voters would have disproportionately affected minority communities. See

33

Zignego v. Wis. Elections Comm'n, 2021 WI 32, ¶¶9-10, 396 Wis. 2d 391, 957 N.W.2d 208. In 2019 a circuit court ordered the "inactive" voters removed from registration lists before the effort was stopped on appeal. Notices were sent to individuals informing them that they would be removed from voter rolls if they failed to respond. Significantly, over one-third of those notices were sent to individuals in Milwaukee County and Dane County——those with the highest minority populations. Additionally, minority voters were almost twice as likely to be incorrectly flagged as having moved as White individuals.[34]

¶204 Third, during the April 2020 election, the early surge of the COVID-19 pandemic caused a state-wide poll worker shortage that necessitated polling places be consolidated. Milwaukee, which has the largest minority population in the state, was hit hardest by these consolidations. Only 5 out of a usual 182 polling sites for the entire city, or 1 polling place for every 103,000 registered voters, remained open to this large minority population. By contrast, Washington County, Ozaukee County, and Waukesha County each had 1 polling place for every 7,000 registered voters.[35] Reports indicate that these disproportionate measures greatly affected voter turnout. One study found that approximately 16 percent of registered Milwaukee voters voted in the April 2020 primary compared to 42

---

[34] Subcomm. on Elections, 117th Cong., Voting in America: Ensuring Free and Fair Access to the Ballot 31-33 (Jul. 2021).

[35] Kevin Morris & Peter Miller, Voting in a Pandemic: COVID-19 and Primary Turnout in Milwaukee, Wisconsin, 58 Urb. Aff. Rev. 597, 598 (2021).

percent of registered voters who turned out in the surrounding Washington, Ozaukee, and Waukesha Counties. Another study indicated that poll closures depressed voter turnout in Milwaukee by 8.6 percentage points with a disproportionate effect on Black voters.[36] Within Milwaukee County, more polls were closed in the areas with the highest percentage of non-White voters.[37] Fourth, Wisconsin has required IDs to vote since 2011. While voter ID laws have been upheld under the federal constitution as lawful, voting data shows such laws disproportionately deter racial minorities from voting.[38]

¶205 Disparities in other socioeconomic categories between Wisconsin's White population and Milwaukee's minority populations, driven by racial discrimination, also hinder the ability of minority populations to effectively participate in the political process (Senate Factor 5). This dissent opened by acknowledging Milwaukee's history of racial discrimination and the lasting racial disparities that history engendered. To reiterate, Milwaukee's history of forced segregation created a historical racial gerrymander, limiting minority populations from the opportunity to exert influence outside of a limited geographic area. Additionally, the low rates of Black

---

[36] Id.

[37] John A. Curiel & Jesse T. Clark, Disparities in Poll Closures in the Age of COVID-19: A Case Study of Wisconsin, 20 Election L. J. 345 (2021).

[38] Michael G. DeCrescenzo & Kenneth R. Mayer, Voter Identification and Nonvoting in Wisconsin——Evidence from the 2016 Election, 18 Election L. J. 342 (2019).

homeownership and high rates of evictions in Black communities result in more transient populations that change addresses frequently. These populations may face difficulties staying registered under the proper address and providing necessary proof of address under voter ID laws. Homeless people face barriers that result in as few as 10 percent of the homeless population showing up to the polls.[39]

¶206 Wisconsin's high disparity between Black and White incarceration rates (the Black incarceration rate is 11.9 times greater than the White incarceration rate) directly affects opportunities to participate in the political process. Felons are disallowed from voting until they have completed their entire sentence, which includes release from probation, parole, or extended supervision. See Wis. Stat. §§ 6.03(1)(b) & 304.078. In 2020, 22,371 Black Wisconsinites were disenfranchised because they were incarcerated or on probation, parole, or extended supervision.[40] Even after an ex-felon's

---

[39] Dora Kingsley Vertenten, As Few As 1 in 10 Homeless People Vote in Elections——Here's Why, U.S. News (Oct. 15. 2020, 10:41 AM), https://www.usnews.com/news/cities/articles/2020-10-15/as-few-as-1-in-10-homeless-people-vote-in-elections-heres-why.

[40] Chris Uggen et al., The Sent'g Project Locked Out 2020: Estimates of People Denied Voting Rights Due to a Felony Conviction 17 (Oct. 30, 2020), https://www.sentencingproject.org/publications/locked-out-2020-estimates-of-people-denied-voting-rights-due-to-a-felony-conviction/.

36

voting rights are restored, evidence shows most will vote at much lower rates than the general public.[41]

¶207 The myriad of other examples of racial disparity in Wisconsin may also account, in part, for the historically limited success minority candidates have had in city- and county-wide elections (Senate Factor 7). Cavalier Johnson just became the first Black person elected to be Mayor of Milwaukee and only the second Black person elected to be mayor anywhere in Wisconsin.[42] In 2020, David Crowley became the first Black person elected to be Milwaukee County Executive. At the time of briefing, no Black office holder held a state representative, alderperson, or supervisor seat in any Milwaukee-area districts outside majority-Black districts. While we can hope that the very recent successes of some city and county-wide candidates is an indication of long-needed change, history and common sense tell us that one successful minority candidate does not erase a long history of discrimination and racial disparity.

¶208 The procedural posture of this remedial redistricting case (specifically that no Equal Protection or VRA challenge was before this court) coupled with the lack of rigorous expert analysis of past elections by any party other than BLOC and the lack of expert cross-examination, hampered this court's ability

---

[41] Jeff Manza & Christopher Uggen, Punishment and Democracy: Disenfranchisement of Nonincarcerated Felons in the United States, 2 Persps. on Pol. 491 (Sept. 2004).

[42] Marvin Pratt became the first Black mayor of Milwaukee in 2004, but only as acting mayor following Mayor Norquist's resignation.

to definitively decide the VRA issues in our March 3 decision. That said, the evidence and expert analysis before us certainly indicates that minorities in the Milwaukee area continue to bear the effects of discrimination in ways that limit their opportunity to participate in the democratic process.

## IV. LESSONS TO BE LEARNED

¶209 This has been a profoundly disheartening odyssey. The unavoidable political nature of remedial redistricting plagued us every step of the way. Too rarely did this process present true questions of law——this court's only area of expertise. At every change in the tide, this court seemed to choose what it hoped to be a short-cut to streamline our voyage, only to find ourselves lost and unable to do our work as a non-partisan court of law. But the redistricting process is likely to stalemate and come before this court again in the future. And when it does, I hope that we have learned our lesson. I hope that we will permit a politically insulated federal court to manage the task. Federal courts are better able to conduct extensive fact-finding through trial-style litigation, a task for which we proved ill equipped.

¶210 If this court does, however, cast off upon this odyssey again in the future, we cannot shy away from the demands of the process. We must hear and test the facts. We must acknowledge our responsibility to implement the best, judicially appropriate maps possible and to fully justify our decisions rather than pawning that responsibility off to party participants. We can and should do so much better.

38

¶211 The majority does not rise to that challenge; instead it locks our sails on a direct course to another set of maps we cannot call lawful. I dissent.

¶212 I am authorized to state that Justices ANN WALSH BRADLEY and REBECCA FRANK DALLET join this dissent.